**KOPPERS CO. v. UNITED STATES et al.**

No. 2856.

United States District Court
D. Minnesota, Third Division.

April 2, 1937.

742

John B. Keeler and Albert A. Mattson, Pittsburgh, Pa., and George W. Morgan, St. Paul, Minn., and Kellogg, Morgan, Chase, Carter & Headley, for petitioner.

Elmer B. Collins, Sp. Asst. to Atty. Gen., Washington, D. C., for the United States.

Edward M. Reidy, Washington, D. C., for Interstate Commerce Commission.

M. L. Countryman, Jr., St. Paul, Minn., for Northern Pac. Ry. Co.

R. J. Hagman, St. Paul, Minn., for Great Northern Ry. Co.

Herman Mueller, Jr., Boston, Mass., for National Industrial Traffic League, intervenor.

BELL, District Judge.

This is an action in equity brought by the Koppers Company, petitioner, against the United States of America, Interstate Commerce Commission, Northern Pacific Railway Company and the Great Northern Railway Company, respondents, to enjoin, annul and set aside an order of the Interstate Commerce Commission entered June 24, 1935, in a proceeding designated Ex parte No. 104, Practices of Carriers Affecting Operating Revenues or Expenses, which requires the respondent carriers to cease and desist, on or before August 15, 1935, from paying allowances to the petitioner for certain alleged terminal services. The general report of the Commission in Ex parte No. 104 will be found in 209 I.C. C. 11, the supplemental report pertaining exclusively to the industry of the petitioner will be found in 209 I.C.C. 421 and our opinion in 11 F.Supp. 467, 470.

The petitioner contends (1) that the findings of the Commission are not sufficient to sustain the order, (2) that the findings of the Commission are not supported by substantial evidence, and (3) that the Commission abused its discretion in denying its petition for a rehearing.

The Commission contends that the reports and order were made after a full hearing, that they are based on substantial evidence and in all respects are regular, proper and lawful.

The carriers neither admit nor deny the reports and the order, but allege that in

compliance with the order each of them filed a tariff effective August 15, 1935, providing for the withdrawal and cancellation of the allowances. They state that they would have continued in force their tariffs providing for the allowance except for the order of the Commission and that they are willing to reinstate such allowances if the order of the Commission is held unlawful.

The order, in effect, deprives the petitioner of an allowance of one dollar per car by the carriers for services rendered by it in switching and spotting cars within its plant at St. Paul, Minnesota. The Commission found that the services were not for the carriers, but were plant services performed by the petitioner for its own benefit and convenience and that the allowances were in violation of the Interstate Commerce Act, 49 U.S.C.A. § 6(7).

The interlocutory injunction was denied on the ground that the evidence on which the reports and order of the Commission were based was not before us and that we therefore did not have the power to question the findings of fact made by the Commission. We held that the order of the Commission was within the scope of its general powers, that it was made after a full inquiry, and that it is entitled to great respect as it represents the opinion of a body of experts on matters within their special knowledge and experience.

The facts presented by the record are comparatively simple. The petitioner is and continuously since 1918 has been engaged in manufacturing coke at St. Paul, Minnesota. Its plant occupies a space more than 4,000 feet in length, more than 800 feet wide at the east end, and gradually diminishes in width to a narrow strip at the west end. The plant trackage is three and one-half to four miles in length, of standard gauge, has maximum curves of eighteen degrees, and leads to approximately twenty points, scattered throughout the plant, where freight cars are spotted for loading and unloading.

Petitioner's plant is served by the two respondent carriers, both of whom maintain yards on lands adjacent to and north of the west end of the plant. The Great Northern yard consists of three tracks from 1,000 to 1,100 feet in length, and the Northern Pacific yard consists of four tracks of approximately the same length. These tracks converge toward the railway entrance to the plant where one track from each yard connects with a track owned by the petitioner. The carriers deliver ingoing freight cars on their respective tracks immediately outside the entrance to the plant where they are received and moved by the industry with its own power as desired to points within the plant for loading and unloading. Outgoing freight cars are moved as desired by the industry with its own power through the entrance of the plant into the yards of the carriers and there received by them. In other words, the yards or tracks of the carriers are used for interchange purposes and are designated in the record as "interchange tracks." The carriers have never performed the switching service for which an allowance has been made to the petitioner. The locomotives of the carriers do not enter the plant property. The switching between the interchange tracks of the railway companies and the points in the plant for loading and unloading is done by the industry with its own power and switching crews.

The industry receives an average of 25 carloads of freight daily, 95% of which is coal. A portion of the coal is switched to coke ovens and the balance to stock piles. That which goes to the ovens must be placed and unloaded at such times as it can be received in the manufacturing operations. Outbound shipments, mostly coke, fluctuate from 15 to 90 carloads daily.

It requires sixteen or more hours per day under normal conditions for a switch engine to perform the required service and from four to eight hours, depending on the volume of business, in moving cars to and from the interchange tracks. The operation of the carriers' locomotives within the plant for the purpose of spotting cars while the industry engine performs the intraplant service would be impracticable.

The average distance from the interchange tracks at the entrance of the plant to loading and unloading points is 1,200 to 1,400 feet, and to the most distant loading and unloading points is nearly 4,000 feet. Track scales are located at the railway entrance to the plant where the interchange tracks connect with the plant tracks. Both loaded and unloaded cars are weighed by the petitioner primarily for its own benefit, but at times use is made of the weights by the carriers for fixing transportation charges.

From 1918 when the industry commenced operation, until February, 1922, the switching service was performed by the industry and no allowance was made. The payment of an allowance was suspended from March 1, 1927, to June 15, 1929, because there was a question as to the legality thereof due to the fact that there were no published tariffs covering such payments. Tariffs providing for a terminal service allowance of $1 per loaded car were published and were in effect from June 15, 1929, to August 15, 1935, when the allowance was discontinued as a result of the order of the Commission herein involved.

The foregoing are the facts substantially as found by the Commission and there is little or no dispute as to their accuracy or that they are supported by substantial evidence. It is the conclusions of the Commission that meet with objection. The conclusions are as follows:

"Under the governing rules the carriers' duty with respect to delivery terminates at the point of interruption, in this case, the scales. In other words, respondents are prevented from performing the spotting service within this plant in an uninterrupted movement at their ordinary operating convenience, and have therefore, fulfilled their common-carrier obligation under the line-haul rates by the delivery and receipt of cars on reasonably convenient interchange tracks. * * *

"In fact, the spotting service must be coordinated with plant operations, and to attain this objective the switching must be performed at such times as will meet the needs of the coke company. No obligation rests upon respondents to perform service beyond the agreed points of interchange solely at the convenience of the industry. * * *

"We find that the respondents have complied with their obligations under the interstate line-haul rates by the delivery and receipt of carload freight on the interchange tracks described of record; that the service beyond the interchange tracks is a plant service; and that by payment of an allowance to the coke company for the service performed by it beyond the interchange tracks on interstate shipments, respondents provide the means by which the coke company enjoys a preferential service not accorded to shippers generally, and refund or remit a portion of the rates or charges collected or received as compensation for the transportation of property in violation of section 6(7) of the act (49 U.S.C.A., § 6(7).)"

.The conclusions of the Commission contained in the first two paragraphs above quoted very properly may be designated conclusions of fact or of ultimate fact. The scales at the railway entrance or gateway of the plant were found to be the "point of interruption" not merely because cars are weighed at the scales, but because the trackage of the carriers is on one side of that point and the trackage of the plant is on the other side, and because up to that point the carriers can move cars without interruption and beyond that point the movement of the cars must be coordinated with the operations of the plant. After arriving at these conclusions of fact, the Commission found that transportation under the line-haul rates ended with the receipt and delivery of cars on the interchange tracks, that the switching and spotting of cars on the plant trackage beyond the scales is a plant service that the carriers are not under an obligation to perform, and that any allowance to the petitioner for the performance of such service is discriminatory and unlawful.

The term "transportation" under Section 1(3) of the Act, 49 U.S.C.A. § 1(3), includes all services in connection with the receipt, delivery and handling of property transported. Transportation includes de-

livery and whatever is necessary to complete delivery the carrier must perform. It is for performing this service that the carrier is paid under line-haul rates. If the carrier fails to make delivery and the consignee through its own instrumentalities completes the delivery, an allowance is proper. Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83; United States v. Baltimore & Ohio Railroad Company, 231 U.S. 274, 34 S.Ct. 75, 58 L.Ed. 218. When the carrier ends transportation by delivery, no allowance is due for service performed by the consignee beyond the point of delivery and an allowance under such circumstances would constitute an unlawful rebate. Act of February 4, 1887, 24 Stat. 379; Act of February 19, 1903, 32 Stat. 847; Act of June 29, 1906, 34 Stat. 584. The fundamental decisive question in this case is whether the spotting of cars for loading and unloading within the plant of the petitioner is a part of the transportation required of the carrier under line-haul rates, and this question depends on whether the service is customary and reasonable. New York Central & Hudson River Railroad Company v. General Electric Company, 219 N.Y. 227, 114 N.E. 115, 1 A.L.R. 417, certiorari denied 243 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941.

In our opinion on the application for the preliminary injunction we did not finally determine the question as to the sufficiency of the findings, but we said:

"It would seem that the main essential ultimate basic fact to sustain the order of the Commission in this case is that the transportation service terminated at the gateway of the petitioner's plant. If that finding of the Commission is sustained by the evidence, then it would follow that the allowances provided for in the tariffs were gratuities paid to the shipper, and clearly preferential. * * *" [11 F.Supp. 469.]

The conclusions and findings of the Commission are definite, explicit, contain the facts decisive of the issues involved in the proceeding, and in our opinion are ample to sustain its order. Therefore, the first contention of the petitioner must be denied.

We now come to the more serious question as to whether the findings are supported by substantial evidence. Courts should exercise the greatest caution in disturbing the findings of an experienced administrative body made in the performance of its duties as prescribed by law. The credibility of witnesses, the weight of the evidence and the conclusions to be drawn therefrom in matters before the Interstate Commerce Commission are for it to determine; and its findings of fact will not be reviewed by the courts if supported by substantial evidence. Merchants Warehouse Company v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227; the Assigned Car Cases, 274 U.S. 564, 47 S.Ct. 727, 71 L.Ed. 1204; Virginian Railway Company v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L. Ed. 463; Western Papermakers' Chemical Company v. United States, 271 U.S. 268, 46 S.Ct. 500, 70 L.Ed. 941. In this connection the court in the Assigned Car Cases said [274 U.S. 564, 47 S.Ct. 733]:

"It is not for courts to weigh the evidence introduced before the Commission, Western Papermakers' Chemical Co. v. United States, 271 U.S. 268, 271, 46 S.Ct. 500, 70 L.Ed. 941; or to inquire into the soundness of the reasoning by which its conclusions are reached, Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U.S. 452, 471, 30 S.Ct. 155, 54 L.Ed. 280; Skinner & Eddy Corporation v. United States, 249 U.S. 557, 562, 39 S. Ct. 375, 63 L.Ed. 772; or to question the wisdom of regulations which it prescribes, United States v. New River Co., 265 U.S. 533, 542, 44 S.Ct. 610, 68 L.Ed. 1165. These are matters left by Congress to the administrative 'tribunal appointed by law and informed by experience.' Illinois Central R. R. Co. v. Interstate Commerce Commission, 206 U.S. 441, 454, 27 S.Ct. 700, 704, 51 L. Ed. 1128."

A drawing of the plant and interchange tracks, exhibit B-8, is in evidence. It shows the location of the plant tracks, the

buildings, coke ovens, coal piles, storage bins, structures of various kinds, and certain equipment of the industry; also the location of the interchange tracks of the carriers on adjacent property. It reveals a system of switching tracks and points for loading and unloading cars, a system that may be used for the continuous movement of a large quantity of coal into the plant and coke out, and that undoubtedly is used chiefly for industrial facilities. The exhibit presents physical facts showing a situation where several miles of tracks have been constructed and are maintained within the confines of a plant to serve an industry of considerable proportions and not to serve as railway terminals; and, furthermore, that the tracks of the carriers were constructed and are maintained on adjacent property to serve as railway terminals or interchange tracks for the benefit and convenience of the industry. While the size of the industry is not decisive of the question, the interruptions at a plant of extensive proportions with an intricate switching system for intraplant service necessarily would be greater than at the ordinary spur or siding.

■ The size and physical arrangement of the plant, the extent of its trackage, the situation governing the switching, the convenience and adequacy of interchange tracks are important basic facts to be considered in the determination of the question as to whether switching and car-spotting service is a part of the transportation required of carriers under line-haul rates or is a plant service. New York Central & Hudson River Railroad Company v. General Electric Company, supra; Merchants Warehouse Company v. United States, supra; Interstate Commerce Commission v. Atchison, Topeka & S. F. R. Co. [Los Angeles Switching Case], 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319.

The Superintendent of Terminals of the Great Northern testified that the extent of the trackage in the plant is about 20,000 lineal feet and that there are twenty spotting points, that it would require the constant attention of a switch engine sixteen hours a day to perform the switching service required, that there is intraplant switching to be done, that by cooperation the interruption could be reduced to a minimum, that classification or a segregation of cars of various kinds of coal is necessary so that they may be spotted at the proper unloading hoppers or stock piles, that the process of classification would result in interruption. This witness, in part, said:

"Q. Are we to understand that answer that this industrial operation must be fed in accordance with the requirements of the industry and their requirements in the spotting of the cars? A. I would say that to some extent, a large extent, that is true.

"Q. Would you say that if your company undertook to perform that service, having in mind both the inbound traffic and the outbound traffic, that it would necessitate the constant placement of a switch engine at the industry to take care of the inbound and the outbound loads? A. My study did not indicate that it would be necessary to have an engine constantly in attendance, but that to handle the plant properly and all the requirements in connection with it, that approximately 16 hours of the day, it would require the constant attendance of a switch engine service.

"Q. About what is the volume of the outbound traffic, expressed in numbers of cars per day? A. They would run from 15 cars to 90 cars a day during the year. It varies, of course. The winter time is the heavier business, in our experience.

\*　\*　\*　\*　\*　\*

"A. Well, to take over the plant as it is today it would take at least four hours' time of an engine, but when this plant is operating continuously I am certain we would find it necessary to serve the plant at least twice a day and that would mean a total of 8 hours and not include any intraplant switching.

"Q. And in addition to your serving that plant for eight hours a day with this engine, it would be necessary for the plant to have an engine of its own to do its intraplant switching? A. Yes, sir, it would."

The Superintendent of petitioner's plant testified as follows:

"Q. This service of placing the cars in positions accessible for loading and unload-

ing at the plant, is that performed by the industry at the present time at times throughout the day that will meet the convenience of the industry? A. Yes, sir.

"Q. Or may it be done whenever the engine is ready to do it? A. I might state this: We have a constant flow of coal and as a result we have a constant flow of coke. If we have 25 cars of coal today and we make about 30 cars of coke a day, the coal is unloaded in an 8 hour period, and the coke is made in a 24 hour period. We have bin capacity sufficient for the coke, so that probably you would hold up four hours' production.

"Q. That is to say if the railroad power entered your plant to do that work, they might lack a set-up in the going that might hold up your plant moving for four hours, is that what you mean? A. Yes, they could do it, provided they got the proper grade of coal at the right time, they could do it in two hours.

"Q. That coal would have to be classified and graded according to the production? A. Yes, sir.

"Q. Your own industrial power does that grading at the present time? A. Yes, sir.

    *    *    *    *    *    *

"Q. And if both railroads undertook to serve your plant and spot their own cars, that is, the Great Northern power spot the Great Northern traffic and the Northern Pacific spot the Northern Pacific traffic and your industry engines performed the intra-plant service, how would that work out? A. That would be like a crazy-quilt.

"Q. It could not be done? A. It could not be done. There would have to be an arrangement, or we would have to get all cars to use only one road.

    *    *    *    *    *    *

"Q. Why do you weigh the empty cars? A. We find there is a very great difference from the stenciled weight and the light weights that we have. They run as much as four or five hundred pounds different.

"Q. You do not do that for the convenience of the railroad, do you? A. No, sir.

"Q. That is for your own convenience? A. For the convenience of ourselves and our customers of coke.

"Q. So you weigh the inbound cars for your convenience and not for the convenience of the railroads? A. 1 would say for our convenience on loss of weight, most of it is for our own convenience.

"Q. Are all your cars weighed inbound? A. Yes, sir."

■ It is significant that the Superintendent of the petitioner's plant testified that "an arrangement" would be necessary to enable the carriers to render the service now performed by the industry. In effect, he admitted that the situation in the plant is such that the carriers cannot enter it to deliver and receive cars except in accordance with an arrangement, evidently meaning some agreed plan of co-ordination of switching and plant operations. Whatever the plan might be, it necessarily would require the supervision of someone empowered to direct operations; and naturally, the management of the plant would be the logical authority in order that the plant might be conducted in an orderly, systematic manner. In short, plant operations must be under unified control. Where an arrangement for the carriers to perform the service under the supervision of the industry is necessary, so as to make it practicable for them to perform it, the switching loses its character as a terminal service and becomes a plant operation. Carriers, to perform the full measure of their duty under line-haul rates, are not required to stand ready with a switch engine at all times to answer the call of an industry to spot cars within its plant.

The testimony might have been more elaborate, more in detail, more conclusive; indeed, the Commission might have arrived at a different conclusion, but that is not the question before us. Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291. The record is not barren of testimony to support the findings of the Commission; to the contrary, there is very substantial evidence to support them. It is obvious from the physical facts contained in ex-

hibit B, from the oral testimony above quoted and from much other evidence in the record that there is such interruption, due to the classification of the coal, the weighing of the cars, the intraplant switching, the necessity of the co-ordination of terminal and plant switching under the supervision of the industry, as to show very clearly that the service is not a part of the transportation required of the carriers, but is a plant operation. Therefore, the second contention of the petitioner must be decided against it.

It is urged that the Commission abused its discretion in denying a petition for rehearing. The supplemental report of the Commission dealing with the petitioner's plant was made June 24, 1935. A "petition for reconsideration" was filed with the Commission which, in effect, sought a reversal on the record already made and which was denied. A "petition for rehearing, reconsideration, further hearing and modification of the order in view of changed conditions" was filed with the Commission on March 12, 1936, and this petition was denied on May 5, 1936. The original bill was filed in this court August 7, 1935, while the petition for "reconsideration" was pending before the Commission. The preliminary injunction was denied August 14, 1935. On September 18, 1936, after the second petition had been denied by the Commission, a supplemental bill was filed in this court alleging the facts pertaining to the denial of the petition for a rehearing by the Commission. However, abuse of discretion by the Commission is not alleged.

To show a "changed condition" it was alleged in the petition to the Commission that (1) the practice of weighing inbound cars had been discontinued, (2) the weighing of outbound cars was continued solely for the benefit of the carriers and might be done by the carriers, (3) that by cooperation between the petitioner and the carriers interference could be eliminated in the switching of cars from the interchange tracks to points within the plant if the carriers performed the service, (4) that if the carriers performed the service they would not be required to "feed" the cars to the plant to meet the requirements of the operations, (5) that the carriers could perform the service without interference, and (6) that to deprive the petitioner of such service would be a discrimination against it and preference to other industries. Manifestly, this petition consisted largely of conclusions, arguments and proposals.

After the hearings had been held before the Commission, the proceeding closed, the case submitted, the reports made after the petition for a "reconsideration" had been denied and after suit had been commenced in this court, the petitioner then asked that the proceeding before the Commission be reopened; and, in effect, that it be allowed a new trial on its representation that it could show a state of facts that would entitle it to more favorable results. Such procedure would not be conducive to the termination of litigation and it is not the procedure in the courts or before the Interstate Commerce Commission. The petitioner does not contend that it did not have a full, fair hearing or that it was deprived of an opportunity to present its testimony. The granting or denial of the petition for a rehearing is a matter for the discretion of the Commission, 49 U.S.C.A. § 16a; and we are convinced that there was not such abuse of discretion as to justify setting aside the order. United States v. Northern Pacific Railway Company, 288 U.S. 490, 53 S.Ct. 406, 77 L.Ed. 914.

It has also been contended on behalf of petitioner that the carriers are required to perform such spotting service here involved by a universally established custom and usage. There is no such custom and usage under the facts presented by the record in this case; indeed, the evidence is decidedly to the contrary. In analyzing the decisions bearing on this phase of the controversy, it is necessary to note the decisive question of fact, always involved, as to the point where transportation ends and industrial operations begin, pointed out in the Los Angeles Switching Case, supra, and the New York Central & Hudson River Railroad Company v. General Electric Company, supra. When this is done it is obvious that only in exceptional instances and in comparatively limited areas have

certain industries been favored with allowances.

The injunction should be denied and the petition dismissed for want of equity. Counsel for respondents may submit findings in accordance with this opinion.

BOOTH, Circuit Judge, concurs in the foregoing opinion.

SANBORN, Circuit Judge (dissenting).

The issue in this case, reduced to its simplest terms, is whether, under the evidence, the service of switching and spotting cars within the plant of the petitioner is a terminal service which the carriers are obligated to perform under their line-haul rates, or whether it is a plant service not covered by the line-haul rates. The Interstate Commerce Commission is of the opinion that it is a plant service, and the industry believes that it is a reasonable and customary terminal service. It may be conceded that if, under the evidence upon which the Commission's findings and order are based, this question of fact is doubtful or debatable, rather than purely speculative, the Commission's order should stand. I am unable to convince myself that the evidence justifies a finding or inference that there are interferences or obstacles to the performance by the carriers of switching and spotting service for the industry which converts what would otherwise be a terminal service into a plant service. It seems to me that the evidence tends to establish that the performance by the carriers of terminal service for the industry would not be any more burdensome than similar services performed by these carriers for other smaller industries connected with the carriers' lines by the spur or industrial tracks. It is not my understanding that a carrier is entitled to spot cars at any industry at the carrier's sole convenience. Obviously, spotting service performed by a carrier on an industry track which serves two or more industries or which is used by two or more carriers must be done under some arrangement between the carriers and industries.

Where such an arrangement is practical, the fact that a carrier is obliged to consult the convenience of an industry or that of another carrier in delivering and spotting cars, should not ordinarily excuse the performance of a terminal service which is covered by the line-haul rates. Demurrage rules take care of unreasonable delays in accepting delivery. While the evidence indicates that this industry weighed cars handled by it after they were received from the carriers, there is no evidence that if the carriers had been required to perform the terminal sevice, the industry would have insisted upon the cars being weighed by them or would have refused to compensate them for weighing such cars as were required to be weighed. The fact that the Interstate Commerce Commission denied a rehearing, asked for by the petitioner because weighing of cars in the plant had been dispensed with, is some indication that the weighing of cars was not regarded by the Commission as a matter of controlling importance.

If the evidence, taking that view of it most favorable to the Commission, is as consistent with the hypothesis that the terminal services which the petitioner insists that the carriers must either perform or pay for are reasonable and customary terminal services covered by the line-haul rates, as with the hypothesis that they are plant services not covered by the line-haul rates, it (the evidence) tends to establish neither hypothesis, but leaves the question in the realm of conjecture. Ewing v. Goode, C.C.S.D.Ohio, 78 F. 442, 444; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Stevens v. The White City, 285 U.S. 195, 204, 52 S.Ct. 347, 76 L. Ed. 699; Eggen v. United States, 8 Cir., 58 F.2d 616, 620; Deadrich v. United States, 9 Cir., 74 F.2d 619, 622; Claywell v. Inter-Southern Life Ins. Co., 8 Cir., 70 F.2d 569, 571; Svenson v. Mutual Life Ins. Co. of N. Y., 8 Cir., 87 F.2d 441, 443.

I think that the order of the Commission should be enjoined for the sole reason that the evidentiary base on which it rests is too weak to support it.