## ILLINOIS CENT. R. CO. et al. v. UNITED STATES.

### Civ. No. 51C 1211.

United States District Court
N. D. Illinois, E. D.

Nov. 2, 1951.

L. L. Oliver, Washington, D. C., and William J. O'Brien, Jr., Chicago, Ill., for plaintiff.

Otto Kerner, Jr., U. S. Atty., Chicago, Ill., for defendant.

Mayer, Meyer, Austrian & Platt, Chicago, Ill., for Chrysler Corp. et al.

Daniel W. Knowlton and Allen Crenshaw, Washington, D. C., for Interstate Commerce Commission.

Before LINDLEY, Circuit Judge, BARNES and PERRY, District Judges.

LINDLEY, Circuit Judge.

This is an action brought pursuant to 28 U.S.C. §§ 1398, 2284, 2321–2325, to set aside an order of the Interstate Commerce Commission fixing maximum rates and adjusting allegedly discriminatory rates charged by plaintiffs and other carriers for the shipment of new passenger automobiles. Joined as defendant with the United States is the Interstate Commerce Commission. Interveners are Chrysler Corporation, Hudson Motor Car Company, Packard Motor Car Company, Nash-Kelvinator Corporation, Studebaker Corporation and Willys-Overland Motors, Inc., all having been complainants in the proceeding before the Commission.

Interveners are engaged in the manufacture and sale of passenger automobiles. They are competitors of General Motors Corporation and Ford Motor Company. Packard, Nash and Hudson each operate single plants, at which they manufacture and assemble their products, located at Detroit, Michigan, Kenosha, Wisconsin and Detroit, Michigan, respectively. Chrysler has its manufacturing plant at Detroit and assembly plants at Evansville, Indiana, Los Angeles and San Leandro, California. Studebaker has its manufacturing plant at South Bend, Indiana and an assembly plant at Los Angeles. Willys-Overland operates a manufacturing plant at Toledo, Ohio and an assembly plant at Los Angeles.

General Motors maintains manufacturing plants at Detroit, Flint, Pontiac and Lansing, Michigan, and assembly plants at Roseland and Doraville, Georgia; Kansas City and St. Louis, Mo.; Linden, N. J.; Wilmington, Delaware; Baltimore, Maryland; Cincinnati, Ohio; Janesville, Wisconsin; Los Angeles, Oakland and Raymer, California; Tarrytown, New York. Ford maintains manufacturing plants at Detroit, and Dearborn, Michigan, and assembly plants at Kansas City and St. Louis, Mo.; Atlanta, Georgia; Louisville, Ky.; Memphis, Tenn.; Norfolk, Virginia; St. Paul, Minn.; Sommerville, Mass.; Chester, Penn.; Chicago, Illinois; Long Beach, Richmond and Los Angeles, California.

The factual situation out of which this litigation has grown is quite complex in its overall aspects, but can, we think, be reduced to relative simplicity for purposes of this decision. Railroads were originally the principal means for transportation of new automobiles. With the development of hard roads, they have been faced with increasingly serious competition from truckers, both common and contract carriers. It became apparent, early in the growth of the competition, that the truck has a distinct advantage over the railroad in the shipment of automobiles on a "short haul". However, as the carriage increases in distance, the truck's advantage shows a marked decrease. This may be attributed to a number of factors, two of the more apparent being that railroads are not so

hampered in their movement, as are trucks, by varying weather conditions, and that the initial rapidity of truck delivery is largely overcome in a long distance haul by the slower but constant movement of the train.

The interveners, other than Chrysler, are the so-called minor producers of passenger cars in this country, who have their plants in the industrial midwest except for small expansions. Their competitors, Ford and General Motors, are the major producers of motor cars. Although these two originated and still maintain their production largely in the midwest, they have, as we have observed, expanded their activities throughout the country. All manufacturers of automobiles market their products in all parts of the country. Hence, for example, it is necessary for Hudson to ship a completed car from Detroit to New York in order to reach that market. So too as to the other interveners, i. e., from their midwest plants. Ford and General Motors on the other hand, assemble their cars at Sommerville, Mass., and Linden, N. J., respectively. Thus their shipment to the common market of New York City is much shorter than that of the interveners. This fact is repeated time and again as Ford and General Motors ship their cars from "strategically located" assembly plants which are near the various regional markets, while interveners must ship their products from their manufacturing plants.

It is thus apparent that, to a great extent, Ford and General Motors shipments are of "short-haul" nature, while those of interveners are, quite generally, long-haul. Due to the truck advantage in short hauls, the railroads have experienced much more competition from truckers in the Ford and General Motors areas than they have from the areas in which interveners manufacture and assemble. To meet this competition, the railroads have lowered their rates on new automobiles moving out of those areas in which Ford and General Motors maintain assembly plants. Not being faced with such severe competition in those areas where interveners manufacture, the railroads have left the rates there at a higher level. As a result situations such as the following have arisen: Studebaker ships cars from its South Bend plant to Keokuk, Iowa. The first class rate is 98 cents per hundred pounds. Studebaker is charged 83 cents per hundred pounds. Ford or General Motors ship cars from their plants at Kansas City, Mo., to Keokuk. The first class rate is $1.01 per hundred pounds. They are charged 41 cents per hundred pounds. Thus, although the destination is common and the first class rates are nearly equal, Studebaker is charged 42 cents per hundred pounds more than Ford or General Motors. Although the differences are not always so great as in this instance, nevertheless this situation is reflected many times in the complete railroad rate structure.

Further pertinent factors include the general increase in automobile production in the past fifteen years and the means normally employed by railroads in determining freight rates. A first-class rate per hundred pounds is first determined, from any given point of embarkation to any given destination, varying according to the length of the haul and the nature of the land over which the route passes. Taking these first class rates as a basis, sub-classes are then established based on the particular commodity shipped. Here such factors as the amount of the commodity ordinarily shipped, its perishability, the general care which has to be accorded it, are taken into consideration. Thus furniture may be shipped at 70%, cattle at 95%, citrus fruits at 100% of first class. When automobiles first became a commodity for rail shipment they were rated at 100% of first class. Later this was reduced to 85% and became the maximum rate that could be charged for transportation of new automobiles. This maximum rate was in effect at the time this litigation was commenced. It should be remembered, however, that lower rates than maximum are permitted, if competition demands. It is this reduction which brings about the disparity previously pointed out.

The complainants before the Commission joined all railroads in the United States which carry new automobiles as respondents. That complaint alleged and sought to remedy: (1) excessive and unreasonable

maximum rates being charged for the shipment of complainants'. new automobiles, in violation of Section 1 of the Interstate Commerce Act, 49 U.S.C.A. § 1; (2) prejudicial rates being charged complainants and, preferential rates being extended to Ford and General Motors for shipment of new automobiles, contrary to Section 3(1) of the Act, 49 U.S.C.A. § 3(1).

The Commission found for complainants and issued an order (1), establishing 75 per cent of first class as the maximum rate which would be charged for the shipment of complainants' new automobiles, except shipments to mountain-Pacific and transcontinental territories; (2), prohibiting maintenance of rates for the shipment of complainants' automobiles which exceeded the rates extended to Ford and General Motors for shipment to common destinations, by more than the difference between 75% of the first class rate out of complainants' plants and 50% of the corresponding first class rate out of Ford or General Motors assembly plants, except in those areas located in mountain-Pacific and transcontinental territories. Plaintiffs filed a petition for reconsideration; this was denied. They then filed their complaint in this court.

Plaintiffs' averments as to invalidity of the order basically raise four contentions: (1) the order is arbitrary, as it is not supported by substantial evidence; (2) the Commission is in effect attempting to equalize economic-geographic advantages held by Ford and General Motors, and, in so doing, is exercising a power not conferred upon it by Congress; (3) the Commission misconstrued and failed to apply Section 15a of the Act, 49 U.S.C.A. § 15a, in issuing its order; (4) the Commission acted arbitrarily in denying the petition for reconsideration. These assertions will be taken up in the order stated.

### The Contention that the Order is Arbitrary and not supported by Substantial Evidence.

 Plaintiffs' first contention hereunder is that the Commission arbitrarily disregarded certain evidence showing that the rates extended intervener, Chrysler,

at its Evansville, Indiana plant were just as favorable as rates offered to Ford and General Motors out of their St. Louis plants to common destinations. This evidence, it is said, would have proved that plaintiffs are not discriminating against interveners. However, the record discloses that the Commission had before it substantial evidence upon this question and considered it carefully. Thus it said: "The Chrysler Corporation has an assembly plant at Evansville where it assembles Plymouth automobiles for shipment to the South and Southwest. Defendants publish some commodity rates from Evansville, but they are on a higher level than the rates from General Motors and Ford assembly plants to the same States. For example, to destinations in Tennessee, rates from Evansville average from 67 to 70 percent of first class, as compared with average rates of 45 to 49 percent of first class from assembly plants of General Motors and Ford. Commodity rates accorded Evansville to the Southwest average 59 percent of first class, while those from the assembly plants of General Motors and Ford to Arkansas destinations average from 34 to 45 percent." We are not concerned with the weight of the evidence except to ascertain from an examination of the entire record whether it supports the Commission's finding in this respect. After such examination we do not feel at liberty to announce that the finding is not supported by the record as a whole. In Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286, 287, 54 S. Ct. 692, 694, 78 L.Ed. 1260, the court said: "* * * The judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body." We believe that such a rational basis existed.

 In 1945 the Commission concluded a general rate investigation in which it surveyed the entire rate structure for new automobiles moving in interstate commerce. At that time it was represented to the Commission that the railroads were engaging in the practice of offering lower rates to Ford and General Motors at their assembly plants, than they were offering Chrysler at

its manufacturing point. The Commission did not then condemn the practice. Plaintiffs now contend that the situation then existing has not changed and that, unless there has been a change in conditions, the Commission is acting arbitrarily in ordering a modification of the rate schedule at this time. In short, plaintiffs are asserting that the Commission is being arbitrarily inconsistent. Irrespective of the fact that there is no requirement that the Commission remain steadfastly consistent in its disposition of matters before it, irrespective of changing times, economics, industrial practices and laws, it is to be observed that the Commission expressed its reluctance to reverse a prior determination unless changes in conditions demanded it. It pointed out, however, that in the ex parte investigation of rates only Chrysler of the present interveners, was represented, thus implying that perhaps a more lucid presentation and consequent understanding of the problem had been presented in this proceeding. The report further shows that the Commission had taken notice of the increase in automobile production and of a general rate increase since its ex parte investigation. These factors, in the opinion of the Commission, warranted a change in position. This court is not permitted to substitute its judgment on economic or industrial problems for the expert opinion of the Commission on such a matter. Board of Trade of Kansas City v. U. S., 314 U.S. 534, 62 S.Ct. 366, 86 L.Ed. 432. It might well be added that the Commission has not completely reversed its prior stand. It has merely modified it somewhat by attempting to temper the variances in rates which it has found exist.

Plaintiffs next assert that there is no showing of an injury to interveners sufficient to provide the foundation for finding establishment of a discriminatory rate. Their position is that a mere difference in rates does not amount per se to discrimination. Injury must be shown to those allegedly discriminated against. Plaintiffs' premises are correct. However, the facts do not support their conclusion. The Commission affirmatively found that the lower rates accorded Ford and General Motors gave them a distinct financial advantage over their competitors due to the pricing system employed in marketing automobiles. It was shown that the practice in the industry is to price the cars on the basis of cost of production plus the rail freight charge from Detroit (or the primary manufacturing plant of the seller) to the retail dealer. Thus in the case of Ford and General Motors, due to the lower rates extended to them from their subsidiary plants, they realize an advantage over their competitors in that there is included in their price a sum greater than the actual cost of transportation. The Commission then reasoned that the correlative of this benefit must be a detriment or injury to the interveners. It said: "In a highly competitive market, in which competition will become even more severe when the abnormal demand for new automobiles is satisfied, those manufacturers having a lower level of rates are benefited and the manufacturers with the higher level of rates are injured. While at the present time the benefit is not reflected at the retail level because of the pricing methods of the manufacturers, it is present in the form of greater funds for use in the various manufacturing operations or for the payment of larger dividends to stockholders. It is clear that General Motors and Ford are benefited and the other manufacturers are injured by the differences in the levels of the rates from their respective plants." Although there may have been no affirmative evidence in terms of "injury" it seems to us that the Commission's ultimate conclusion in this respect was inescapable. Northeast Kentucky Coal Bureau v. C. & O., 206 I.C.C. 445, sustained in Chesapeake & Ohio R. Co. v. U. S., 296 U.S. 187, 56 S.Ct. 164, 80 L. Ed. 147, the Commission said: "Even though complainant's members may not be injured, their competitors are preferred. Preference, not necessarily injurious in itself, affords opportunity to gain success over and injure the other party. The act is specifically directed against undue preference and all other forms of unjust treatment of the shipping public." We think this is a correct analysis and applicable to the situation here.

324

■■ Next plaintiffs insist that the inconsistent handling by the Commission of rates to the west coast and rates charged for the shipment of freight automobiles, as compared with the conclusions reached in regard to passenger cars in all areas other than the west coast, are fatal to its order. It was shown that the rates extended to Chrysler, Willys and Studebaker at their west coast assembly plants were on a par with the rates extended to Ford and General Motors at their plants similarly located. The Commission's order in the treatment of the alleged discriminatory rates excluded the mountain-Pacific and transcontinental territories from its operation. Hudson, Nash and Packard do not maintain west coast plants. Plaintiffs now contend that if the interveners are being discriminated against in their shipments to territories other than mountain-Pacific and transcontinental, then Packard, Nash and Hudson are being discriminated against in their shipments to those territories. Accordingly, they assert, the exclusion of the Hudson, Nash and Packard shipments to the western territories in the discrimination order amounts to a patent inconsistency which renders the order invalid as arbitrary. The argument is persuasive. However, it appears that the Commission has long divided the country into shipping territories, the mountain-Pacific and transcontinental being two of several. Different treatment may be applied to different territories based on a difference in shipping conditions. When it is realized that shipments to the west coast must pass over the Rocky Mountains, it seems only logical that certain adjustments must be made. Furthermore, there was affirmative evidence given by Packard, Nash and Hudson that they were not being injured by the difference in rates offered them in their shipments to the west coast and those rates extended to those producers who have plants located on the west coast. Thus, though on its face it would seem the treatment rendered is inconsistent, when the facts are considered it does not appear to us that there is such inconsistency as to invalidate the order. Furthermore the failure of the Commission to enter any affirmative order as to the west coast rates amounted to a decision in plaintiffs' favor. How plaintiffs' success in this respect can bolster their claim that the order is invalid is difficult to visualize.

■ Plaintiffs assert that in failing to include freight automobiles in the order the Commission exhibited an additional inconsistency. The Commission stated in its report that the evidence adduced did not warrant a finding that freight auto shipments had been subjected to unlawful rates. Plaintiffs assert that the evidence introduced on both types of automobiles was substantially the same. Accordingly, they say, any difference in treatment must be arbitrary. The Commission insists that there was a difference in the evidence. However, assuming that the evidence was similar, it would seem that the difference in the number of freight autos produced as compared to the number of passenger autos produced and shipped would afford a reasonable basis for a difference in treatment.

■ It appears that plaintiffs' most serious contention, under their insistence of lack of substantial evidence, is that the Commission failed to report how it arrived at the 50–75 per cent formula. In its findings and conclusions the Commission makes a general finding that discrimination in fact exists. But it expresses no precise basis for its order. However, there are included in its report, tabulations of the average differences, on a percentage of first class basis, between interveners' rates and the rates extended Ford and General Motors. From the ultimate decision it is clear that the Commission concluded these differences were excessive. However, obviously, the Commission felt that truck competition on short hauls did justify a difference in rates in some degree. The absence of the precise mathematical calculations employed by the Commission in reaching its final decision should not vitiate its conclusion and the remedy which it has adopted. In the extremely involved determination of rates, the actual basis for formulae is well-nigh incapable of definition. Thus the Supreme Court says: "The reasonableness of rates cannot be proved by categorical answers, like those given, where a witness may, in

terms, testify that the goods were worth so much per pound, or the services worth so much a day. Too many elements are involved in fixing a rate on a particular article, over a particular road, to warrant reliance on such method of proof. The matter has to be determined by a consideration of many facts." Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541 and 549, 32 S.Ct. 108, 111, 56 L.Ed. 308.

## The Contention that Commission Exercised Powers not Conferred by Congress.

Plaintiffs' argument in this respect is based on the proposition that the Commission, in issuing its order, is not in fact remedying discriminatory treatment of interveners, but instead is attempting to equalize economic-geographic advantages held by Ford and General Motors. Plaintiffs concede that all shippers do not have to be accorded the same treatment under the law and that it is proper for varying rates to be extended when competition and shipping conditions warrant such action. They insist that the Commission is not endowed with power to equalize economic-geographic advantages held by Ford and General Motors. This is also true. However, the Commission made an affirmative finding that discrimination in fact was present. The fact that economic-geographic advantages are intermixed in the discrimination does not mean that the Commission cannot remedy the wrong. Thus, the fact that the secondary effect of the Commission's order may tend to equalize the good fortune of Ford and General Motors should not invalidate the order if it is, as in this case, based on a proper finding of discrimination. In their assertion that the Commission is powerless to equalize the advantages which General Motors and Ford enjoy due to the strategic location of their assembly plants, they rely upon Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 32 S.Ct. 22, 56 L.Ed. 83 and Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225. However, we think that an analysis of each of those cases supports the order rather than invalidates it.

## The Assertion that the Commission Failed to Apply Section 15a of the Act.

Section 15a of the Act provides that in fixing rates the Commission shall consider the revenue needs of the carriers in order properly to maintain an efficient and adequate mode of transportation for the public. Plaintiffs insist that the Commission failed to consider the effect of its order in that the railroads will necessarily lose large revenues if they comply with it. Though this section indicates the general purpose of the Act, it in no way detracts from the power granted the Commission to bring about a reduction of unreasonably high rates by Section 1, or the abolition of discriminatory rates by Section 3(1). It appears that plaintiffs demand that the Commission recite in its report that in fact it has kept in mind the provisions of Section 15a in promulgating its order. The fact that plaintiffs will suffer a loss in revenue when they cease charging interveners discriminatorily high rates does not lead to a conclusion that the Commission ignored the spirit of the Act in issuing its order. It would seem, if anything, to point to just the opposite. In Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 288, 93 L.Ed. 243, the court said: "Rate structures are not designed merely to favor the revenues of producers and carriers. The Commission has the consumer interest to safeguard as well. And when it undertakes to rationalize the interests of the three, great complexities are often encountered. The economics of the bituminous coal industry have baffled even experts. We would depart from our competence and our limited function in this field if we undertook to accommodate the factors of transportation conditions, distance *and competition* differently than the Commission has done in this case. This is a task peculiarly for it. In fashioning what the Commission called a differentially related and finely balanced rate structure for this coal, there is no place for dogma or rigid formulae. The problem calls for an expert, informed judgment on a multitude of facts. The result is that the administrative rate-maker is left with broad

discretion as long as no statutory requirement is overlooked. Yet that is, of course, precisely the nature of the administrative process in this field. See Board of Trade [of Kansas City, Mo.] v. United States, 314 U.S. 534, 548, 62 S.Ct. 366, 372, 373, 86 L. Ed. 432; State of New York 'v. United States, 331 U.S. 284, 347–349, 67 S.Ct. 1207, 1240, 1241, 91 L.Ed. 1492. (Emphasis supplied.)".

### The Commission's Refusal to Grant Plaintiffs a Reconsideration.

It appears in the Commission's report that to a great extent its decision was based on composite figures presented by plaintiffs showing the shipment of new automobiles in interstate commerce during January 1948. The Commission recognized that this was not an "entirely representative" month, due to conditions then prevailing. When the order was issued plaintiffs petitioned for a reconsideration, offering to introduce additional evidence which they considered more representative. This petition was denied. Plaintiffs assert that this was an abuse of discretion in the face of the Commission's own admission that the evidence relied upon was not completely representative.

Plaintiffs did not show that the evidence they offered at the time of the petition for reconsideration was not available to them at the time of the hearing. Furthermore, petitions for rehearing are discretionary. The Commission having admitted that January 1948 was not an entirely representative month, the record is persuasive that adjustments were made so that the true situation was reflected.

In Interstate Commerce Commission v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 1136, 88 L.Ed. 1420, concerning the discretion of the Commission involved in disposing of petitions for rehearing, the court said: "The rule that petitions for rehearings before administrative bodies are addressed to their own discretion is uniformly accepted and seems to be almost universally applied in other federal courts. United States ex rel. Maine Potato Growers & Shippers Ass'n v. Interstate Commerce Commission, 66 App.D.C. 398, 88 F.2d 780,

784, certiorari denied 300 U.S. 684, 57 S. Ct. 754, 81 L.Ed. 886; Mississippi Valley Barge Line Co. v. United States, D.C., 4 F. Supp. 745, 748; Union Stock Yards Co. [of Omaha] v. United States, D.C., 9 F.Supp. 864, 873; American Commission Co. v. United States, D.C., 11 F.Supp. 965, 972; R.C.A. Communications v. United States, D.C., 43 F.Supp. 851, 858." In United States v. Northern Pacific R. Co., 288 U.S. 490, at page 494, 53 S.Ct. 406, at page 407, 77 L.Ed. 914, the court said: "Though the order substantially reduced the carriers' revenues, we do not consider the merits of the application for rehearing, as we think the carriers' lack of diligence in bringing this matter to the Commission's attention deprived them of any equity to complain of the refusal of their petition. They sat silent and took the chance of a favorable decision on the record as made. They should not be permitted to reopen the case for the introduction of evidence long available and susceptible of production months before the Commission acted. The denial of a rehearing, in view of this delay, was not such an abuse of discretion as would warrant setting aside the order."

### Other Contentions.

Plaintiffs also contend that the order is invalid as to them as they have no control over the rates charged by other carriers, and, therefore, the latter cannot be ordered to comply with the general rate scheme developed by the Commission. This argument loses sight of the fact that the proceedings were designed to bring about a national uniformity on this problem. Furthermore, all carriers of new automobiles were joined as defendants, the order thus running to all involved in the rate making structure. It was shown that the railroads arrive at rates through committees at which all the roads are represented. Thus it would seem that the Commission's blanket order was proper and that plaintiffs are bound thereby. In Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 583–585, 69 S.Ct. 278, 285, 93 L.Ed. 243, the Supreme Court decided that railroads that merely participated in joint rates were equally liable with railroads that published

the rates for undue prejudices and preferences resulting therefrom, saying: "The Milwaukee and Illinois Central were granting more favorable rates to some origins than to others in the same groups or districts. Their single-line rates from mines on their own lines were much lower than joint-line rates from other mines in the same group to the same destinations. The latter are rates published by other carriers and in which Milwaukee and Illinois Central join. Milwaukee and Illinois Central therefore are parties to an arrangement which results in some mines getting lower rates than other mines in the same group on shipments to the same destinations."

As has been noted, all of the above arguments deal with the disposition of discriminatory rates. It should be recalled that the order set 75 per cent of first class as the maximum rate that could be charged interveners for the shipment of their automobiles. This represents a reduction from 85 per cent of first class which presently exists as the maximum rate. The only apparent attack on this portion of the order lies in a general allegation that the order is not supported by substantial evidence. However, it appears that this determination was based on several factors including the general increase in production, and hence the shipments, of automobiles; a general increase in the first class rates which resulted in a corresponding increase in automobile rates; a comparison of the rates charged for automobiles with those charged for furniture, livestock, citrus fruit, etc. We think that this aspect of the order was supported by substantial evidence.

Our function is well defined. Thus, if an order lies within the scope of the statute, which the Commission is empowered to administer and enforce and is based upon adequate findings which, in turn, are supported by substantial evidence, we may not set it aside or modify it, even though we would have decided otherwise originally and even though it is against the weight of the evidence. United States v. Illinois Central R. Co., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417. " * * * To consider the weight of the evidence before the Commission, the soundness of the reasoning by which its conclusions were reached, or whether the findings are consistent with those made by it in other cases, is beyond our province." Virginian Railway Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 224, 71 L.Ed. 463. Thus, in United States v. Chicago Heights Trucking Co., 310 U.S. 344, 60 S.Ct. 931, 935, 84 L. Ed. 1243, the court said: " * * * from the beginning the very purpose for which the Commission was created was to bring into existence a body which, from its peculiar character, would be most fitted to primarily decide whether from facts, disputed or undisputed, in a given case, preference or discrimination existed. * * * And the courts have always recognized that Congress intended to commit to the Commission the determination, by application of an informed judgment to existing facts, of the existence of forbidden preferences, advantages and discrimination." Bearing these rules in mind, after due consideration, we are of the opinion that nothing in this record justifies our interference with the Commission's order.

We regret that the short period of time remaining before the date for enforcement of the order as extended and the necessity for early disposition prevent more detailed discussion of the evidence or enlargement of our analysis thereof. However, we hope we have said enough to make clear the reasons for our decision.

The contents of this memorandum are hereby made a part of our more formal findings of fact and conclusions of law of even date herewith.

Judgment will enter dismissing the complaint.