George W. LEGGE and Co-Operative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania

v.

UNITED STATES of America, Interstate Commerce Commission and the Monongahela Connecting Railroad Company.

Civ. A. No. 64–836.

United States District Court
W. D. Pennsylvania.

July 6, 1965.

Albert D. Brandon, Pittsburgh, Pa., for plaintiffs.

John H. D. Wigger, Atty., Dept. of Justice, Washington, D. C., Gustave Diamond, U. S. Atty., Pittsburgh, Pa., for defendant United States.

Arthur J. Cerra, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendant, I.C.C.

Before STALEY, Circuit Judge, and MARSH ˙ and ROSENBERG, District Judges.

ROSENBERG, District Judge.

This action is brought pursuant to the provisions contained in 28 U.S.C.A. §§ 1336, 1398, 2284, 2321–2325, 49 U.S.C.A. § 17(9) and 5 U.S.C.A. § 1009 and § 25 of the Interstate Commerce Act, as amended.

It is brought here by George W. Legge [1] and Cooperative Legislative Committee, Railroad Brotherhoods in the State of Pennsylvania, as plaintiffs, and based upon a decision of the Interstate Commerce Commission granting the application of the defendant, Monongahela Connecting Railroad Company, to remove 46 interlocking signals, switch machines from all switches, crossovers and movable point crossing frogs, interlocking machine from the tower and all interlocking appurtenances at the location of the Monongahela Connecting Railroad Company. The plaintiffs seek to annul and set aside the actions of the Interstate Commerce Commission and its final order of June 16, 1964.

The defendants, the United States of America and the Interstate Commerce Commission, filed a joint answer, and the Monongahela Connecting Railroad Company filed its separate answer denying, generally, the averments of the plaintiffs and any need for relief in this connection. A hearing was thereafter set and the parties heard. From all that was presented which included the record of the proceedings before the Interstate Commerce Commission, this determination is made.

On August 23, 1962, the defendant Monongahela filed its application with the Commission for permission to modify the railroad's signal control system at its 29th Street Tower on the South Side of Pittsburgh and to discontinue the interlocking plant there. The application was based upon the railroad's level of present and predicted business as not justifying the continuing use of the system, as well as that preceding the application when there had been a continuous and significant reduction in the

---

1. George W. Legge is the Chairman of the Cooperative Legislative Committee.

operations of the Pittsburgh Works of the Jones and Laughlin Steel Corporation, the railroad's principal customer.

The Brotherhoods Committee and its Chairman Legge objected to the change of operations and an initial hearing was held February 21, 1963. Factual questions were raised after testimony was taken and the Hearing Examiner recommended that the application be denied. The Examiner's finding was that the "applicant has not made the requisite showing and that the application should be denied."

The Examiner pointed out in his report that "[t]he truth of the matter is that applicant did not on this record get to the hard core of this matter and indicate with adequate specificity the actual number of movements it now has through the involved interlocking."

On July 3, 1963, the Monongahela filed with the Commission a petition requesting further hearing for the purpose of introducing additional evidence relating to daily movements, etc. In the petition it set forth a number of factual matters which it desired to present at the hearing. At the same time, Monongahela requested "that the time for filing exceptions to the recommended report of the Hearing Examiner be modified to thirty days following the Commission's action respecting the foregoing petition for further hearing."

On July 8, 1963, the Commission postponed until further order the time for filing exceptions. No exceptions were filed at any time. On July 31, 1963, further hearings were ordered. These were held on October 24 and December 13, 1963. At these later hearings additional evidence was introduced showing the density of movements through the interlocking area, the amount of and the factors responsible for the substantial decline in tonnage, and the safety aspects of the proposed modification.

On April 7, 1964, the Hearing Examiner made a second report and order, in which he incorporated the original report and order, and made findings of fact and a recommendation that the application be granted. Thereafter, the Committee and its chairman filed various exceptions. These were dismissed with the comment that

"The heart of this case is that applicant conducts only a slow speed switching operation. All operations are conducted on yard tracks, at speeds not to exceed 12 miles per hour, and in addition, are prepared to stop short of other movements, obstruction or switch not properly lined."

In the brief and at the argument, counsel for the plaintiffs raised three contentions: (1) the Commission in reopening the case on July 31, 1963 violated Rule 197(A) of the Interstate Commerce Commission Rules of Practice and the provisions of 49 U.S.C.A. § 17(5); (2) the Commission misread the testimony in determining traffic density between the first and second hearings so as to treat a substantial traffic increase as a traffic decrease; and (3) the Commission misconstrued the objective of the Safety Appliance Act and imposed an unnecessary peril to life and limb upon the employees.

■ In its brief, the plaintiffs' counsel conceded " * * * that this Court does not have the power or the right to substitute its discretion for that of the Interstate Commerce Commission and that, in fact, this Court should only reverse in a case like this, if in fact, the Interstate Commerce Commission either acted contrary to law or exercised its discretion in an arbitrary and capricious manner."

First, was the Commission bound by its order of June 6, 1963? There is a distinction between the time when an order becomes effective and the time when it is final and no longer subject to examination by the Commission. 49 U.S.C.A. § 17(5) provides:

" * * * [I]f within twenty days after service upon such persons, or within such further period as the Commission or a duly designated division thereof may authorize, no

exceptions shall have been filed, such recommended order shall become the order of the Commission and become *effective* unless within such period the order shall have been stayed or postponed by the Commission or by a duly designated division thereof." (Emphasis supplied) [2]

The petition of the railroad for further hearing was filed on July 3, 1963, within thirty days of June 6, 1963, the date of the order following the first hearing. The petition for further hearing was disposed of by the Commission on July 31, 1963. There is no rule of the Commission or any law which requires that the Commission pass on a petition for further hearing within thirty days of the service of the recommended order. Accordingly, we find that the Commission was not bound by its recommended order of June 6, 1963.

When on July 3, 1963, within the thirty days, Monongahela filed its petition for a further hearing, the Commission on July 8th postponed the time until further order for filing exceptions, it acted within its discretionary statutory power. 49 U.S.C.A. § 17(5). "Administrative rehearings are not matters of right but of pleas to discretion. The discretion to be invoked is that of the body making the order, not that of a reviewing body" Northern Valley Transfer, Inc., v. I.C.C., 192 F.Supp. 600, 606 (D.C.N.J., 1961). See also, Interstate Commerce Commission v. City of Jersey, 1944, 322 U.S. 503, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420. The granting or denial of petitions for rehearings are matters for the discretion of the Commission. Koppers Co. v. United States (D.C.Minn., 1953), 114 F.Supp. 741. Shein v. United States (D.C.N.J., 1951), 102 F.Supp. 320, affirmed 343 U.S. 944, 72 S.Ct. 1043, 96 L.Ed. 1349; Illinois Central Railroad Co. v. United States (D.C.Ill., 1951), 101 F.Supp. 317.

Second, was the Commission's findings relating to traffic density so erroneous as to amount to an abuse of its discretion? We think not. The General Superintendent of the railroad testified that the tonnage which the railroad handled between 1953 and 1957, inclusive, and the tonnage which it handled between 1958 and 1962, inclusive, showed a reduction of 25%. We believe that the Hearing Examiner reasonably found that the number of movements is related to tonnage. There was evidence that the number of moves made daily by the railroad through this interlock were reduced from 70 to 55 between the first and second five-year periods. It was developed that the figure of 110 movements, found by an employee of the Commission, represented separate entries on the towerman's sheets, and did not represent separate movements. Many times an entry was made for a movement into the interlock and another entry for a movement out of the interlock, when actually there was but one movement through the entire interlock. The Hearing Examiner correctly found that the 110 figure set forth in his first report was erroneous because certain movements were counted twice. These were factual determinations. They are subject neither to revision nor substitution by the courts. *Greyhound Corp. v. United States,* (D. C.N.D.Ill., 1963), 221 F.Supp. 440.

Third, did the Commission consider all factors necessary to make a determination of the element of safety? We think it did. As the testimony developed it became obvious that speed was not essential to the operation through the interlocking area. The maximum speed now permitted by the railroad is 12 miles per hour. The number of switches in the interlock is to be reduced from 34 automatic switches to 10 hand-thrown switches. The General Superintendent of the railroad, V. A. Barnhart, Jr., the

---

2. I.C.C. Rule 1.96(b) provides "Within 30 days after service of the officer's report, any party may file and serve exceptions thereto and reasons in support thereof. Replies may be served and filed as provided in § 1.23. In any case the Commission may, in its discretion, upon notice to the parties reduce or extend the time for filing exceptions or replies."

Superintendent of Transportation of the railroad, Harry A. Carter, and the Trainmaster, Paul F. Getty, all testified that the operations of the proposed modification would be safe. They elaborated their testimony and proved that safety would be increased by the adoption of hand-thrown switches instead of the automatic switches existing at the present time. No accidents occurred during a five-week period when the automatic switches were discontinued and hand-thrown switches were used between June 28, 1962 and September 7, 1962. Trainmaster Getty in fact testified that the continuation of the automatic system would present a hazard because it allows trainmen to develop a false sense of security regarding the system. On the other hand the plaintiffs produced no witnesses who testified regarding accidents which would occur due to the change or modification of the system.

■■ The evidence of the case supports the Commission's findings, and particularly that one in the recommending order of March 31, 1964. There, the Hearing Examiner said: "As seen, the record is now convincing that adequate protection and safety would continue under the applicant's proposal." Even though we may disagree with the Commission (although there is no reason for us to do so here), we cannot substitute our opinion for that of the Commission as it draws its conclusions from the evidence. United States v. Louisville and Nashville Railroad Co., 235 U.S. 314, 35 S.Ct. 113, 59 L.Ed. 245, 1914; Greyhound Corporation v. United States, supra.

With this contention the plaintiffs have interjected the provisions contained in the Safety Appliance Act. It is argued at page 12 of their brief, that the hazards involved in requiring men to get on and off trains and in throwing hand switches "apt to be fouled" and the "increase in danger due to great number of pushing movement and men not being able to ride on the sides of the cars or to pass hand signals at all times, constitute violation of the objectives of the Congress that passed this Act and also passed the Act and also passed the Amendment of the Federal Employers' Liability Act * * *"

It is argued further at the same page, "The Examiner in neither the first or second opinion, nor did the Commission, consider whether or not these admitted increases in hazard ran against the requirements of paragraph 26 of Title 49 U.S.C.A." The plaintiffs' counsel argues that the Commission was mindful of the preferences of the protestants and did not believe that the employee dislike of throwing these switches was a ground to retain an interlocking plant. They argue "under any fair reading of the objectives of paragraph 26 of Title 49 it will be seen that a railroad company should not be permitted to discontinue an interlocking plant which would cause any unnecessary peril to life and limb."

■ It is upon these further arguments that the plaintiffs base their conclusion that the Commission's refusal to consider these risks amounted to an abuse of discretion. From the record, it is apparent that the Commission did not refuse to consider all the risks involved, and did make a safety finding which is supported by the evidence. Neither is there anything contained in this provision of the Safety Appliance Act which would prevent the Commission from finding that the applicant had "made the requisite showing and that the application should be granted", as this finding is supported by the record.

There is nothing in the record to support the plaintiffs in a showing that they are entitled to any relief. The decision of the Commission will be affirmed. The plaintiffs' complaint will be dismissed and judgment will be entered in favor of the defendants.