The ATCHISON, TOPEKA AND SANTA
FE RAILWAY COMPANY et al.,
Plaintiffs,

v.

UNITED STATES of America and Inter-
state Commerce Commission,
Defendants.

Civ. A. No. 62 C 2306.

United States District Court
N. D. Illinois, E. D.

June 27, 1963.

R. H. Bierma, Chicago, Ill., J. P. Canny, Cleveland, Ohio, John C. Danielson, J. A. Gillen, W. P. Higgins, R. J. Lehman, Don McDevitt, R. J. Murphy, Joseph J. Nagle, Chicago, Ill., for plaintiffs.

Philip H. Porter, Madison, Wis., for intervening plaintiffs, Patrick Cudahy, Inc., Oscar Mayer & Co., and Dubuque Packing Co.

Lee Loevinger, John H. D. Wigger, Department of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., Chicago, Ill., for defendant United States of America.

Robert W. Ginnane, Arthur J. Cerra, Interstate Commerce Commission, Washington, D. C., for defendant Interstate Commerce Commission.

Byron M. Gray, Topeka, Kan., for intervening defendant, State Corporation Commission of Kansas.

Warren H. Wagner, Washington, D. C., for intervening defendants, John Morrell & Co., The Rath Packing Co., and Geo. A. Hormel & Co.

Marcus Whiting, Chicago, Ill., for intervening defendant, Armour & Co.

Nuel D. Belnap, Harold E. Spencer, Daniel J. Sweeney, Chicago, Ill., F. T. Barrett, Omaha, Neb., Belnap, Spencer, Hardy & Freeman, Chicago, Ill., of counsel, for intervening defendant, Cudahy Packing Co.

Before CASTLE, Circuit Judge, and HOFFMAN and AUSTIN, District Judges.

JULIUS J. HOFFMAN, District Judge.

In this action, the plaintiff railroads seek an order setting aside and permanently enjoining orders of the Interstate Commerce Commission entered on September 11, 1962, and December 7, 1962, in the proceeding entitled Cudahy Packing Company v. Akron, Canton & Youngstown Railroad Company, et al., I.C.C. Docket No. 32551. Defendants are the United States of America and the Interstate Commerce Commission. Intervening as plaintiffs are Patrick Cudahy Inc., Oscar Mayer and Company, and Dubuque Packing Company. Intervening as defendants are the Cudahy Packing Company, John Morrell & Company, the Rath Packing Company, Geo. A. Hormel & Company, and the State Corporation Commission of Kansas.

■ A three-judge court was convened in accordance with title 28 U.S.C. §§ 2284 and 2325. Jurisdiction over this proceeding is conferred by title 28 U.S.C. § 1336. The scope of review to which we are limited is prescribed by title 5 U.S.C. § 1009(e) (Administrative Procedure Act).

The Chicago, Milwaukee, St. Paul and Pacific Railroad Company, one of the plaintiffs herein, has its principal offices in the Northern District of Illinois.

The Cudahy Packing Company instituted the proceeding before the Commission, joining most of the nation's railroads as defendants. In its complaint, Cudahy alleged that the rail rates on fresh meats and packinghouse products from its meat packing plants at Omaha, Nebraska, Denver, Colorado, and Wichita, Kansas, to destinations throughout the United States were relatively unjust and unreasonable, unduly prejudicial to the complainant, and unduly preferential of competitors with plants at other origins in the Midwest, in violation of sections 1 and 3 of the Interstate Commerce Act, 49 U.S.C. §§ 1 and 3. The complaint specifically refers to the rates from Omaha, Denver, and Wichita, but it was broadened during the Commission proceedings to include other complaining origins, and the Commission report states that the issues presented upon the record concern the rate relationships of midwestern origins in general on and west of the Illinois-Indiana State line. The complaint sought new origin relationships in the rates from the Midwest to the East and to the West. Various midwestern packers, commissions, and associations were allowed to intervene, some supporting the complainant and some supporting the defendants in the Commission proceeding.

The Commission, on September 11, 1962, in the order here assailed, found that the rail rates from points west of the Mississippi River to official territory (i. e., the area east of the Illinois-Indiana State Line and north of the Ohio River) were unduly prejudicial to such origins and shippers there located and unduly preferential to origins and shippers on and east of the Mississippi River, in violation of section 3(1) of the Act. The Commission, in all other respects, found that the rates had not been shown unlawful.

On December 7, 1962, the Commission denied the petitions of the defendants and intervening defendants (as aligned before the Commission) for reconsideration of the report and order.

The effect of this order is to require the railroads to provide for all origins west of the Mississippi River the same relative level of rates on fresh meats and packinghouse products as those maintained from Dubuque, Iowa, to destinations in official territory, as tested by uniform percentages of the Docket 28300 first-class rates. (For background information concerning the territorial divisions, class rates, exception rates, and commodity rates, see New York v. United States, 331 U.S. 284, esp. 289–90 nn. 1–3, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947)).

The existence of the rate disparity which the Commission found to exist is not contested in this proceeding. Illustrative of the disparity is a comparison, made by the complainant in the Commission proceedings, between the through rates on fresh meats, in boxes, from Omaha to New York and from Dubuque to New York. The Omaha rate, with a distance of 1,358 miles, is 207 cents; it is 35.4% of the current docket 28300 class-100 rate, and at a minimum of 30,-000 pounds produces car-mile revenue of 45.7 cents. The Dubuque rate, with a distance of 1,061 miles (86% of the Omaha-New York distance), is 143 cents (69.-1% of the Omaha-New York rate); it is 28.5% of the class-100 rate, and produces car-mile revenue of 40.4 cents. (P. 9 of Commission report. Page references for the Commission report are for the copy of the report made "Exhibit A" by plaintiffs and appended to the complaint.) The disparity, it was shown, was not justified by the difference in cost of service to the two regions; the rate spread was shown to be substantial-

ly greater than the cost spread for these areas.

██ In challenging the validity of the Commission's order, plaintiffs and intervening plaintiffs (all hereinafter included in the term "plaintiffs") contend that: (1) The Commission failed to make certain basic and essential findings of fact necessary to support the conclusions reached therein; (2) The Commission unlawfully found that the existence of facts justifying an inequality in freight rate treatment was a matter of defense to be proved by the defendants in the Commission proceeding; and (3) The Commission's ultimate finding that the involved rates are unduly prejudicial to certain shippers and unduly preferential to others is not supported by substantial evidence of record, and, in fact, is contrary to the evidence.[1]

## I. BASIC OR ESSENTIAL FINDINGS OF FACT

Plaintiffs urge that an order of the Commission made under section 3(1) of the Interstate Commerce Act, finding rates to be unduly prejudicial to certain shippers and unduly preferential to other shippers, must be supported by certain basic or essential findings, namely, (1) That a disparity in freight rates exists; (2) That this disparity has injured the party allegedly prejudiced and benefited the party allegedly preferred, and (3) That traffic from both the prejudiced and preferred points moves under substantially similar circumstances and conditions. Plaintiffs assert that the Commission has not made findings of fact on number (2) and (3) above, and that, as a result, the order is invalid.

Defendants take the position that the Commission has made all the basic findings necessary to support its order. De-

fendants further contend that, in any event, the Commission is not required to make an express finding of similarity of transportation conditions. We shall first consider whether the Commission is required to find such a similarity of conditions as support for its order under section 3(1) of the Act, and whether, if it is so required, it has done so.

(a) *Substantial Similarity of Transportation Conditions*

Defendants first contend that the Commission, in an order under section 3(1), need only make the ultimate statutory finding that the rates in question are unduly preferential to some shippers and unduly prejudicial to other shippers, and enough subsidiary findings to show that the Commission has considered the several factors relevant to its conclusion. Defendants assert that the Commission was not required to make a specific finding that the transportation conditions are substantially similar.

██ Section 14(1) of the Interstate Commerce Act, 49 U.S.C. § 14(1), requires only that the report of the Commission (except in damage cases) "shall state the conclusions of the Commission, together with its decision." Nevertheless, a finding in the language of the applicable statutory provision is not enough; the report must contain, in addition, those "basic or essential findings required to support the Commission's order." Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291 (1931). To the same effect, see Alabama Great So. R. R. v. United States, 340 U.S. 216, 71 S.Ct. 264, 95 L.Ed. 225 (1951); Chicago & E. Ill. R. R. v. United States, D.C., 107 F.Supp. 118 (1952), aff'd, 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1953); Stanislaus County,

1. On oral argument, counsel for the railroad plaintiffs made passing reference to another ground for challenging the validity of the Commission order: that the order went beyond the issues embraced in the complaint before the Commission by including in its mandate the removal of prejudice to origins not alleged to have been prejudiced. (P. 8, Transcript of Proceedings, May 28, 1963.) We shall not consider this contention, inasmuch as it appears to have been made for the first time on oral argument, and then only by incidental reference. The contention does not appear in any of the briefs of the plaintiffs or intervening plaintiffs, nor does it appear in the petitions for reconsideration made before the Commission.

Calif. v. United States, 193 F.Supp. 145 (N.D.Cal.1960).

█ The "basic findings" which the Commission must make are those which are essential to the existence of its authority to promulgate the rule or enter the order in question. Lubetich v. United States, 315 U.S. 57, 62 S.Ct. 449, 86 L.Ed. 677 (1942); United States v. Baltimore & O. R. R., 293 U.S. 454, 463, 55 S.Ct. 268, 79 L.Ed. 587 (1935). "[T]he basic findings essential to the validity of a given order will vary with the statutory authority invoked and the context of the situation presented." Alabama Great So. R. R. v. United States, 340 U.S. 216, 228, 71 S.Ct. 264, 272, 95 L.Ed. 225 (1951).

█ Defendants suggest that "basic findings" are not required to support an order made by the Commission under section 3(1), relying principally upon Chesapeake & O. Ry. v. United States, 11 F. Supp. 588 (S.D.W.Va.), aff'd, 296 U.S. 187, 56 S.Ct. 164, 80 L.Ed. 147 (1935). In that case, the district court stated:

> "[o]nly the ultimate condition and not formal and precise findings of fact, are required of the commission in order to bring a particular case within the terms of this section of the statute. United States v. B. & O. Ry., 293 U.S. 454, 55 S.Ct. 268, 79 L.Ed. 587. \* \* \*
>
> "\* \* \* *No case is cited on behalf of petitioner which holds that when the commission makes an order under section 3 of the act it must make any finding in addition to one couched in the language of the statute.* It is difficult to see just what further findings of fact, other than those made by the commission, could have been made in order to justify the order entered." 11 F.Supp. at 593–594. (Emphasis supplied.)

The language relied upon by defendants in this decision is not persuasive. First, it should be understood that the B. & O. case, relied upon by the district court in the above quotation, supports the proposition that section 14 of the ICA

requires that the Commission make findings only upon the "ultimate condition" and does not require (except in damage cases) that detailed findings be made. The B. & O. case, however, recognized that basic, or quasi-jurisdictional, findings are required. Second, in Chesapeake, the Commission's findings were not made solely in the language of the statute; the district court stated that "Here the commission has not only found the ultimate condition bringing the case within the terms of the statute but has also found the specific facts." 11 F.Supp. at 593. And it ruled that the Commission had made all findings necessary "to justify the order entered." 11 F.Supp. at 594. In affirming the district court's decision, by a *per curiam* decision, the Supreme Court stated:

> "This Court, upon an examination of the record, agrees with the conclusion of the District Court that the order in question *was sustained by findings of the Commission* acting within its statutory authority and that these findings were adequately supported by evidence." 296 U.S. 187, 188, 56 S.Ct. 164. (Emphasis supplied.)

Against this background, it is evident that the italicized sentence in the above quotation from the district court decision in Chesapeake is dictum.

Defendants further rely upon Community & Johnson Corp. v. United States, 156 F.Supp. 440 (D.N.J.1957), as supporting the proposition that in addition to the ultimate finding, the Commission need only show that it took cognizance of the evidence concerning essential issues and weighed it along with other factors. In that case, the court stated, 156 F. Supp. at page 443, that

> "\* \* \* there were findings of fact made on those points which the Commission considered relevant to settling the controversy before it. This is all that the statute requires. Capital Transit Co. v. United States, D.C.D.C.1951, 97 F.Supp. 614, 621."

Although this may be all that the *statute* requires, it is not all that the courts require where a basic finding is in issue.

The proposition that the Commission's findings under section 3 are exempt from the "basic finding" requirement is unsupported by any logical reason for an exemption. Other cases have applied this requirement to orders under section 3. In New York Cent. R. R. v. United States, 207 F.Supp. 483 (S.D.N.Y.1962), and Stanislaus County, Calif. v. United States, 193 F.Supp. 145 (N.D.Cal.1960), the Commission's findings in section 3 cases were held to be insufficient to sustain its orders. To the same effect, see Boston & Me. R. R. v. United States, 202 F.Supp. 830 (D.Mass.1962), aff'd, 83 S. Ct. 1312, 10 L.Ed.2d 419 (1963). And in New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947), where the Supreme Court was concerned with sections 3 and 15(1) of the ICA, the Court upheld the Commission's findings with respect to a violation of section 3 as sufficient, without any suggestion that the ultimate statutory finding was alone enough.

Defendants finally contend that in the cases relied upon by plaintiffs, the basic findings found lacking were ultimate statutory findings. In a number of cases, however, the basic findings held lacking have *not* been ultimate statutory findings.

At this point it is useful to observe that there appear to be three principal categories of decisions regarding the "basic finding" requirement:

(1) In one category, the Commission's findings have been held insufficient because its ultimate finding was not that required by the statute in question. Thus, in United States v. Baltimore & O. R. R., 293 U.S. 454, 55 S.Ct. 268, 79 L. Ed. 587 (1935), the Court held that where the statute authorized the Commission to make changes in safety rules where required to remove "unnecessary peril to life or limb," the Commission's order modifying a safety rule on the ground that "safety" required the change was invalid.

(2) In a second category, the Commission's findings have been held insufficient because, although it made the correct ultimate statutory finding, it employed an incorrect legal test in reaching that finding. Thus, in Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L. Ed. 291 (1931), the Commission had found that certain intrastate rates resulted in an "unjust discrimination against interstate commerce," in violation of section 13(4) of the Act, as then worded. The Commission's supporting findings were based upon comparisons between the inter- and intrastate rates. The Supreme Court held, however, that the Commission could not find an unjust discrimination against interstate commerce unless it considered the relationship of intrastate rates to the income of the railroads and found that the revenue from intrastate traffic placed an undue burden upon the interstate traffic. Thus, in arriving at its ultimate finding, the Commission had failed to employ the right legal test. See also Texas & Pac. Ry. v. Interstate Commerce Com'n, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896).

(3) In a third category, the Commission's findings have been held insufficient because, although the Commission made the correct ultimate statutory finding, and although the Commission showed at least an awareness of the correct legal test to be employed, it failed to make sufficiently explicit its supporting findings. Thus, in United States v. Chicago, M., St. P. & Pac. R. R., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935), the Commission had found that a proposed rate reduction would be "unreasonable" under section 15 of the Act. It supported this conclusion essentially by its finding that the proposed rates would be disruptive of a general rate structure. The Supreme Court held that this finding was not in itself a sufficient basis for the order canceling the proposed rates, and that certain other findings, in addition, were essential. The Court noted

that the report of the Commission contained certain inferences or suggestions with respect to the factors involved in those findings which the Court held were lacking; the Court, however, stated:

"The difficulty is that it has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi-jurisdictional findings of an administrative agency. * * * We must know what a decision means before the duty becomes ours to say whether it is right or wrong." 294 U.S. at pp. 510–11, 55 S.Ct. at p. 467.

See also Atchison T. & S. F. Ry. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382 (1935), and Stanislaus County, Calif. v. United States, 193 F. Supp. 145 (N.D.Cal.1960).

■ We now turn to the question, is a finding of "substantial similarity of transportation conditions" a basic or quasi-jurisdictional finding which the Commission is required to make to support an ultimate finding that rates are unduly prejudicial to certain shippers and unduly preferential to certain other shippers, in violation of section 3 of the Act? Is such a finding essential to the existence of the Commission's authority to enter the order here in question?

Section 3(1) of the Act, 49 U.S.C. § 3 (1), provides as follows:

"It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsover; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway;

transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsover: *Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description."

Under this provision, the ultimate statutory finding required for a disparity in rates to be held unlawful by the Commission is that the rate disparity amounts to an "undue or unreasonable preference or advantage" to a particular person, company, etc., or to an "undue or unreasonable prejudice or disadvantage" thereto. Preference or advantage, on the one hand, and prejudice or disadvantage, on the other hand, are not unlawful. They must be "undue or unreasonable" before they violate this provision.

■ As plaintiffs have shown, and defendants do not dispute, both the Interstate Commerce Commission and the federal courts have ruled that undue prejudice or preference does not exist unless the transportation conditions with regard to the prejudiced and preferred points are substantially similar. ICC: Corn and Corn Products—Iowa, Nebr., Minn., & So. Dak. to Ill., Iowa, Wis., Docket No. 3387, —— I.C.C. —— (Sept. 20, 1962); Iron Ore Rate Cases, 41 I.C.C. 181, 190–91 (1916). Fed.Cts.: United States v. Illinois Cent. R.R., 263 U.S. 515, 524, 44 S.Ct. 189, 68 L.Ed. 417 (1924); Interstate Commerce Com'n v. Baltimore & O. R. R., 145 U.S. 263, 283–284, 12 S.Ct. 844, 36 L.Ed. 699 (1892); State Corporation Com'n of Kansas v. United States, 184 F.Supp. 691, 698 (D.Kan. 1959).

■ It follows that the correct test of "undue" preference or prejudice is whether those circumstances exist under substantially similar transportation conditions; it also follows that a finding of such transportation conditions is essential to the Commission's authority to find a section 3 violation. Cf. Stanislaus

County, Calif. v. United States, 193 F. Supp. 145, 148 (N.D.Cal.1960).

In the Commission report here in issue, the ultimate statutory finding was made that "the assailed rates on fresh meats and packinghouse products from origins west of the Mississippi River to destinations in official territory are, and for the future will be, unduly prejudicial to such origins and shippers there located and unduly preferential of origins and shippers on and east of the Mississippi River * * *." (Report of the Commission, at p. 28.) No specific supporting finding was made, however, that the rate disparity existed under substantially similar transportation conditions.

It seems reasonable to hold that even if the Commission has failed to state specifically in its reports that the rate disparity in question exists under substantially similar transportation conditions, the Commission has, in effect, made this essential finding if it has made clear subsidiary findings upon the specific issues of similarity and dissimilarity involved in the proceeding.

Plaintiffs do not concede that the Commission has made "subsidiary" findings on the issue of similarity or dissimilarity of transportation conditions. They state that the Commission, at page 25 of its report, asserted that the question to be answered was "whether the difference in treatment occurs under substantially similar transportation conditions," that the Commission then set out a summary of the testimony and evidence on both sides of the question, and that the Commission then failed to make any conclusions thereon. We cannot agree.

The specific issues concerning dissimilarity raised by the defendants in the proceedings before the Commission were (1) that there were more burdensome and time consuming terminal operations at Omaha than at other origins, and (2) that there was keen motor carrier competition at origins on and east of the Mississippi River as compared

with the relatively little truck competition at origins west of the river.

There is no question that these two factors are properly to be considered in determining whether a substantial similarity of transportation conditions exists in the two areas. See, e. g., Mississippi Valley Iron Co. v. Chicago & N. W. Ry., 104 I.C.C. 243 (1925) (terminal conditions); and Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 592, 69 S. Ct. 278, 93 L.Ed. 243 (1949) (carrier competition). Of course, the mere fact of competition alone does not necessarily justify a rate preference or prejudice; the character and extent of the competition may be such as not to warrant the disparity. Interstate Commerce Com'n v. Alabama Midland Ry., 168 U.S. 144, 167, 18 S.Ct. 45, 42 L.Ed. 414 (1897). The same is logically true with regard to difficult terminal operations.

In this report, as has been noted above, the Commission correctly stated the legal test to be employed in arriving at an ultimate finding of undue preference and prejudice. It then stated that "The existence of facts justifying an inequality of treatment is a matter of defense to be proven by satisfactory evidence." (P. 26.) It then referred to both issues of dissimilarity presented by defendants and rejected the defendant's contentions.

Thus, this is not a "category 2" case, in which the Commission has failed to employ the correct legal test of undue prejudice or preference. Nor is this a "category 3" case, in which the Commission has only inferred or suggested its opinion with respect to the basic finding and the factors which comprise it. Although the Commission did not state precisely that the transportation conditions were substantially similar, it considered and ruled upon those issues of dissimilarity which were involved in the proceeding. It would be pedantic to invalidate the order because the Commission failed to state "We therefore find that the rate disparity exists under substantially similar transportation conditions," when it has found that those dissimilarities relied upon by the railroads were

not sufficient to justify the rate disparity.

The controversy over whether the Commission has made the basic finding or the supporting findings which comprise it revolves essentially about the meaning of the paragraph appearing on pages 26 and 27 of the report. It must be said that this paragraph could better have stated its purpose. Its meaning is plain, however, when read in the context of the report.

After finding that the origins west of the river are disadvantaged competitively by the rate disparity, the report in this paragraph states as follows:

"* * * The question is whether that disadvantage amounts to undue prejudice; that is, whether the difference in treatment occurs under substantially similar transportation conditions. The existence of facts justifying an inequality of treatment is a matter of defense to be proven by satisfactory evidence. Continental Steel Corp. v. New York, C. & St. L. R. Co., 256 I.C.C. 167, 173, and cases there cited. The basis for the establishment of the rates approved in the Eastern case [where the Commission approved truck competitive rates for traffic from on and west of the river to official territory] was truck competition, but as indicated above there are truck movements to the East from at least as far west as Denver. A witness for the defendant testified that terminal operations in Omaha are most difficult than at other origins. It is shown by restating the complainant's cost evidence, introduced to show that costs do not justify the existing rate spreads, that the proposed rate spreads over Dubuque, on shipments to New York, would be less that the differences in the costs. In connection with the latter, the same situation exists in the rate and cost differences between Chicago, on the one hand, and, on the other, Madison, Davenport and St. Louis. However, the defendants themselves have established motor-competitive rates for comparable distances from the Midwest, including Omaha, to the South, and, as considered in the Western case, transcontinentally to the Pacific Coast from origins in the areas here under consideration. It has been noted that the difference in motor competition is one of degree [it was found on page 20 that there was motor competition from west of the river, although not as great as that from on and east of the river], but as stated in Oklahoma Corp. Comm. v. Kansas, O. & G. Ry. Co., 266 I.C.C. 495, 501:

"The fact that the adjustment to the prejudiced and preferred points is a part of an extensive group adjustment, is not a valid excuse for the continued maintenance of an unduly prejudicial relation between the rates to the Oklahoma and Kansas points. There is truck competition to both sets of points, and although the volume of the truck movement may not be as great to the Oklahoma destinations as to parts of western trunkline territory, such difference in volume as may exist does not afford justification for the maintenance of the prejudicial relation."

Plainly, the Commission meant in this paragraph that although there was a difference in the degree of motor competition as between the area west of the river and that on and east of the river, the defendants had not shown that the difference affords justification for the maintenance of the prejudicial relation. All that had been shown was that the more westerly competition was not as great as the more easterly competition. As will be shown, the defendants had the burden of establishing that the difference in competition justified the rate disparity. Continental Steel Corp. v. New York, C. & St. L. R. R., 256 I.C.C. 167, 173 (1943).

 Also, it is clear that the Commission meant that the defendants' showing with regard to the nature of the Omaha facilities was not sufficient to justify the rate disparity. It obviously weighed this consideration against the evidence pertaining to cost; it found that the cost-rate spreads which would exist under the proposed rates were similar to those prevailing in the more easterly region, and that lower, motor competitive rates had been established by the railroads from the Midwestern origins, *including Omaha*, to the South and Pacific Coast. The Commission was not required to find, in support of its ultimate conclusion of undue prejudice and preference, that the Omaha terminal operations were *not* more burdensome and time consuming that those at other terminals, but only that those operations, weighed against other relevant considerations, were not such as to warrant the rate disparity. *Substantial* similarity of transportation conditions, not *absolute* similarity, is required.

 Plaintiffs have also argued that, aside from the basic finding requirement, the Commission's report fails to conform to the provisions of section 8(b) of the Administrative Procedure Act, 5 U.S.C. § 1007(b), which requires that agency decisions

> " * * * include a statement of (1) findings and conclusions, as well as the reasons or basis therefor, upon *all the material issues of fact*, law, or discretion presented on the record * * *." (Emphasis added.)

Plaintiffs contend that the Commission failed to make a finding on a "material issue of fact" when it failed to find a substantial similarity of transportation conditions. Defendants contend that under section 14(1) of the ICA, the Commission need not comply with section 8(b) of the APA.

No reason appears for exempting the ICA from the requirements of section 8(b) of the APA; as noted by plaintiffs, various decisions have referred to this provision as applicable to Commission reports. See Burlington Truck Lines v. United States, 371 U.S. 156, 167, 83 S.Ct. 239, 9 L.Ed.2d 207 (1963); Boston and Me. R. R. v. United States, D.C., 208 F.Supp. 661, 671 n. 14 (1962), aff'd, 371 U.S. 26, 83 S.Ct. 117, 9 L.Ed.2d 95 (1963); Chicago & E. Ill. R. R. v. United States, D.C., 107 F.Supp. 118, 124 (1952), aff'd, 344 U.S. 917, 73 S.Ct. 346, 97 L.Ed. 707 (1953).

But the Commission has complied with this provision; it has ruled upon the "material issue of fact" regarding the similarity of transportation conditions.

(b) *Injury to Prejudiced Party*

 Plaintiffs correctly assert that to establish undue preference or prejudice before the Commission, the complainant must establish that a rate disparity results in an advantage to the preferred points and a disadvantage, or injury, to the prejudiced points. Illinois Cent. R. R. v. United States, 101 F.Supp. 317 (N.D.Ill.1951). Plaintiffs contend that in the case at bar the Commission has failed to make the essential or basic finding of injury to the complainant and intervening complainants.

We cannot agree that the Commission has failed to make a finding on this issue. The report of the Commission contains a lengthy discussion of the nature of competition among meat packers, noting, among other facts, the small margin of profit in the industry; the dependence of the industry upon transportation because of the large proportion of meat products which is distributed outside of the states where the meat is slaughtered; the intensification of competition in recent years; and other relevant conditions. The Commission report states, on the basis of these various conditions, that "Because the consuming markets usually are far from the production centers, the cost of transportation is an important factor." (P. 4.) Noting the complainant's small earnings in the 1952–58 period, the report states "It is thus plain that transportation costs and rate relations between the various packing-plant origins, the differences often ex-

ceeding the margin of profit, are of considerable importance in the competitive situation." (P. 5.) It notes that in some respects, the more distant western packers have an advantage in the cost of cattle, but also notes that they have no such advantage in the cost of hogs. It discusses extensively the degree of rate disparity between the points east of the river and those on and west of the river and finds that the rate spread is considerably greater than the cost spread between these areas. It specifically finds, at page 26, that "It is clear that origins west of the river are disadvantaged competitively in being subject to rates to the East which are relatively higher than those from competing origins on and east of the river."

These findings amply express the Commissions' conclusions on the issue of injury.

■■■ Plaintiffs strongly urge, however, that there is no substantial evidence of injury to the complainant to support this finding.

It is clear that there is ample evidence concerning the character of the industry to support the Commission's findings of small profit margin, intensive competition, and great dependence upon transportation for the marketing of the product. Plaintiffs in no way contest the Commission's conclusions regarding the existence of a significant rate disparity which is not justified by the cost spread between the areas in question. Nor is there any question that the two areas compete in the eastern market. The Commission has concluded on the basis of these factors that the western origins are clearly disadvantaged competitively by the rates.

Essentially, it is plaintiffs' position that these factors alone are legally insufficient to establish injury. They contend that injury cannot be held to exist where the rate disparity has not impaired the growth and development of the packing industry in the prejudiced area; where shipments have continued to move from such area to official territory; and where the packers in the preferred area do not control selling prices in the eastern market. There is no evidence to show that any of these factors, which plaintiffs contend are necessary to establish injury, pertain in the present case.

The question thus presented is whether injury to the prejudiced area from a rate disparity is established by proof of the existence of intensive competition and small profit margins in an industry highly dependent upon transportation of its product to distant markets.

Stated this way, it is evident that the question is not one of the sufficiency of the evidence to support the Commission's finding of injury, but rather whether the Commission employed the proper test of injury in reaching its finding.

Several decisions support defendants' position that the Commission employed the proper test of injury.

In Illinois Cent. R. R. v. United States, 101 F.Supp. 317 (N.D.Ill.1951), plaintiffs contended that there had been no showing of injury. The district court held to the contrary, affirming the Commission's order under section 3 of the Act. The court stated that "Although there may have been no affirmative evidence in terms of 'injury' it seems to us that the Commission's ultimate conclusion in this respect was inescapable." The court pointed out that in a highly competitive market, even if the preferred shipper did not pass on to the consumer the rate saving, the shipper nevertheless had greater funds available for dividends or manufacturing operations, as a result of the rate preference. Thus, the preferred shippers had a competitive advantage, and the prejudiced shippers suffered a competitive disadvantage.

In Northeast Kentucky Coal Bureau v. Chesapeake & O. Ry., 206 I.C.C. 445, aff'd sub nom. Chesapeake & O. Ry. v. United States, 11 F.Supp. 588 (S.D.W.Va.), aff'd, 296 U.S. 187, 56 S.Ct. 164, 80 L. Ed. 147 (1935), the Commission held there was undue preference, even if the complainant's members might not lose business as a result of the rate disparity.

(The traffic in question was prospective.) The Commission stated, at p. 448 of its report:

"Even though complainant's members may not be injured, their competitors are preferred. Preference, not necessarily injurious in itself, affords opportunity to gain success over and injure the other party. The act is specifically directed against undue preference and all other forms of unjust treatment of the shipping public."

In the district court opinion in this case, the court stated:

"It was also shown in the evidence before the commission that the members of the complainant bureau were damaged by the difference in the rates, through loss of the sale of their coals by having to charge a higher price per ton. The mere fact that there was a discrimination in rates of itself would carry with it the presumption that the parties paying the higher rate were damaged." 11 F.Supp. at 592.

Washington Potato & Onion Shippers Ass'n v. Union Pac. R. R., 300 I.C.C. 537 (1957), is closely in point. There, the evidence showed that the prejudiced area had in recent years increased its volume of production and sales, while the shipments from the preferred area to the same markets had declined or showed a lesser percentage of increase than shipments from the prejudiced area. The Commission held that injury to the prejudiced shippers had nevertheless been established. It stated, at pages 551 and 555 of its report:

"The extent to which each of the many factors which affect the production and marketing of potatoes in these states contributed to these results is not shown, nor is such a showing essential to the determination of the issues.

\* \* \* \* \* \*

"Injury results when, as here, shippers, in selling in competitive markets, are compelled to absorb differences in rates greater than those which are warranted by the differences in service, measured by the transportation standard, as compared with those of their competitors. The fact that the burden of such injury may be mitigated or neutralized by circumstances of a nontransportation nature favorable to such shippers does not render the injury any less real."

Also closely in point is Consolidated Mining & Smelting Co. of Canada, Ltd. v. New York Cent. R. R., 299 I.C.C. 231 (1956), aff'd sub nom. Ores From United States and Canada Origins to Eastern United States, 303 I.C.C. 87 (1958). There, the opinion of division 2 states as follows:

"The fact that Tadanac lies beyond the international boundary and other circumstances incidental thereto but which do not concern the service under the rates considered herein, are not germane to the issues. Nor does the fact, also stressed by defendants and interveners, that shipments have continued to move from Tadanac to the destination territory in substantial and increased volume despite the rate disparity complained of rebut the showing of undue preference and prejudice. A patent discrimination in rates is not to be condoned because other competitive advantages and disadvantages wholly unrelated to the service of transportation may favor a shipper complaining of such discrimination. When sales are made under keen competition in common markets, as they are here, the correlative of the advantage gained from the lower rate level must be a detriment or injury to a competitor who must ship on the higher level. Northeast Kentucky Coal Bureau v. Chesapeake & O. Ry. Co., 201 I.C.C. 165, 206 I.C.C. 445; sustained in Chesapeake & O. Ry. Co. v. United States, 296 U.S. 187, [56 S.Ct. 164, 80 L.Ed. 147]. Compare Illinois Central R. Co. v. United States, [D.

C.] 101 F.Supp. 317, 323." 299 I.C.C. at P. 244.

These decisions amply support the Commission's ruling that injury has been established in the case at bar. The Commission employed a proper legal test of injury when it found that the rate disparity was a clear competitive disadvantage to the origins east of the river, in light of the intensive competition and small profit margins in the industry.

Plaintiffs rely upon Danville Chamber of Commerce v. Southern Ry., 209 I.C.C. 571, 572 (1935), as holding that to support a finding of advantage or detriment, it must be shown that shipments are made or prevented because of the rate relationship. I find no statements concerning the movement of shipments in the Danville case. Moreover, that was a reparation case. In Washington Potato & Onion Shippers Ass'n v. Union Pac. R. R. and Consolidated Mining & Smelting Co. of Canada, Ltd. v. New York Cent. R. R., supra, injury was found despite the continued movement of shipments.

Plaintiffs cite no cases in support of their contention that injury cannot be found where the rate disparity is not shown to have impaired the growth and development of the packing industry in the prejudiced area. In Rath Packing Co. v. Ahnapee & W. Ry., 296 I.C.C. 693, 711–12 (1955), where the same rate disparity as that here in question was found not unduly prejudicial, the Commission noted that the increase in shipments of the allegedly prejudiced shippers compared favorably with that of the allegedly preferred shippers. The Commission concluded there was no showing of competitive advantage or detriment. At most, however, this finding was an alternative basis for the Commission's finding of no undue prejudice or preference. And the finding on injury is clearly contrary to the results in the Washington Potato and Consolidated Mining cases.

In urging that injury cannot be found unless it is shown that the preferred shipper controls prices in the destination market, the only case cited which specifically refers to price setting is W. B. Collins Cotton Co. v. Alabama Great So. R. R., 203 I.C.C. 165 (1934). That case, like Danville, was a reparation case. It is instructive to note that in Swift Lumber Co. v. Fernwood & Gulf R. R., 61 I.C.C. 485 (1921), aff'd sub nom. United States v. Illinois Cent. R. R., 263 U.S. 515, 44 S.Ct. 189, 68 L.Ed. 417 (1924), the Commission refused to grant reparations to complainant on the ground that complainant had not shown that its competitors fixed prices, or that complainant had paid and bore the freight charges on the shipment. Nevertheless, the Commission found that the rates in question violated section 3, and this finding was sustained on appeal.

On oral argument, counsel for intervening plaintiffs presented an interesting contention with respect to the argument that the prejudiced shippers are not injured unless it is shown that the preferred shippers control prices in the destination market. He contended that a competitive disadvantage alone would constitute injury only where the preferred competitor monopolizes or denominates the market. On this basis, he attempted to distinguish Illinois Cent. R. R. v. United States, supra, pointing out that in the instant case, the preferred shippers supply only 5 per cent of the meat sold in the East, whereas the prejudiced packers and other packers who enjoy no rate advantage over them supply 95 per cent of the meat sold in the East. In contrast, he says, the Illinois Central case involved a rate relationship which worked to the disadvantage of Chrysler and to the advantage of Ford and General Motors. He presented no figures as to the market positions of these companies, but undoubtedly the market for new automobiles is a different type of market than that for meats. Nevertheless, we should be reluctant to distinguish the two cases on the ground that market domination of Ford and General Motors compelled the decision in the Illinois Central case. Undoubtedly, Ford and Gener-

al Motors face competition from many companies other than Chrysler. Moreover, neither the Northeast Kentucky Coal Bureau case, nor the Commission decisions discussed above, reflect the view that market domination is required before a competitive disadvantage can be held to constitute injury.

The final argument of plaintiffs concerning injury is that since a Commission order to remove undue prejudice must be alternative in form, permitting the carrier to raise the preferential rate or lower the prejudicial rate, or both, there is no undue advantage or detriment unless the injury to the prejudiced area can be cured by any method which the carrier may choose to erase the rate disparity. Plaintiffs assert that if the rates from the area on and east of the river to official territory are raised, traffic will be diverted to the motor carriers. Thus, the area west of the river, still paying the higher rail rates, will still suffer the competitive disadvantage they now bear.

 It does not appear that this contention was made before the Commission. Consequently, it is not properly raised before this Court. United States v. Capital Transit Co., 338 U.S. 286, 291, 70 S.Ct. 115, 94 L.Ed. 33 (1949). It is appropriate, however, to comment upon this argument.

Plaintiffs rely principally upon Traffic Bureau, Lynchburg Chamber of Commerce v. Chesapeake & O. Ry., 234 I.C.C. 765 (1939), and Darling & Co. v. Alton & So. R. R., 299 I.C.C. 393 (1956). In both cases, the Commission asserted that a rate increase at the preferred points would not help the complainant, because those points would still have available the lower rates on competing motor or water carriers. In both cases, too, however, the rate disparity in question was clearly justified by the competition existing at the preferred points between rail and other carriers. See also Evansville Chamber of Commerce v. Atchison, T. & S. F. Ry., 196 I.C.C. 349, 351–52 (1933), where it was found that a rate increase

from the preferred points would not benefit the prejudiced area.

 In contrast, in the case at bar the Commission has ruled that a difference in degree of motor competition, such as would justify the rate disparity, has not been established. We cannot, therefore, assume that if the rail rates were increased from origins east of the river, most of the meat traffic from those origins would be diverted to the motor carriers, while that from west of the river would continue to move at the higher rail rates. The Commission has found that motor competition exists to some extent from as far west as Denver and is increasing from the westerly region. (Pp. 15 and 19.) The Commission also states that "While Cudahy maintains its own fleet of rail refrigerator cars, if the rate situation is not relieved, it threatens to obtain its own trucks and scrap the rail equipment." (P. 19.) It thus may well be that if rail rates from the preferred origins are increased to eliminate the present disparity, traffic from both the preferred and prejudiced origins will be diverted to the motor carriers. We cannot assume to the contrary, as it is the function of the Commission to make findings of fact. In effect, plaintiffs are asking this court to rule on the evidence that motor competition from the area on and east of the river is substantially greater than that from the area west of the river, and is the real cause of injury to the western packers. The Commission considered it could not so rule on the basis of the "meager" evidence in the record; nor can this court so rule under the scope of review to which it is limited.

 It must be noted that in the instant case, the Commission order permits the railroads the alternative of raising the preferential rates or lowering the prejudicial rates, or both. Complainant has from the outset sought only that the rate disparity be removed and has been willing to leave to the railroads the method of removing the prejudice. In contrast, in Rath Packing Co. v. Ahnapee & W. Ry. Co., 296 I.C.C. 693 (1955),

where these same rates were involved, the Commission stated:

" * * * these complainants do not seek, but would oppose an alternative order which could be complied with by increasing the rates from the points allegedly preferred. They seek only reduction in the rates from their shipping points."

Where the complainant seeks only a reduction of the rates applicable to it, section 3 relief is unavailable. See Northeast Kentucky Coal Bureau v. Chesapeake & O. Ry., 206 I.C.C. 445, at 447, aff'd sub nom. Chesapeake & O. Ry. v. United States, 11 F.Supp. 588, 591, 592 (S.D.W.Va.), aff'd 296 U.S. 187, 56 S.Ct. 164, 80 L.Ed. 147 (1935). But that is not the situation here.

## II. BURDEN OF PROOF

 Plaintiffs assert that the Commission erred in placing the burden of proof upon the defendants in the ICC proceeding to establish that dissimilar transportation conditions justify the rate disparity. Plaintiffs admit that where an aspect of transportation conditions is one as to which the railroads have peculiar knowledge, the railroads properly should bear the burden of proof with regard to that issue; they admit, therefore, that the difficulty of the operating conditions at the Omaha terminal was a matter as to which they properly bore the burden of proof. See Chesapeake & O. Ry. v. United States, 11 F. Supp. 588, 593 (S.D.W.Va.), aff'd 296 U.S. 187, 56 S.Ct. 164, 80 L.Ed. 147 (1935), holding that the railroads bore the burden of establishing unequal operating conditions, inasmuch as the railroads had peculiar knowledge concerning their own operations.

Plaintiffs assert, however, that the Commission improperly placed the burden of proof upon them to establish that motor carrier competition encountered east of the river was greater than that encountered west of the river, to a degree justifying the rate disparity. They assert that they had less access to information about carrier competition east

of the river than did the complainant shipper.

The ICC rulings on this subject strongly support the Commission's position that the defendant carrier bears the burden of showing that carrier competition justifies the rate disparity. Under those decisions, the defendant carrier has the burden of establishing that carrier competition justifies a rate disparity, once the complainant has established a prima facie case of undue prejudice or preference, without reference to such competition. White & Bagley Co. v. Boston & Me. R. R., 279 I.C.C. 715 (1950); Furniture From St. Louis, Mo., to the Southwest, 272 I.C.C. 665 (1948); Bryant Paper Co. v. New York Cent. R. R., 264 I. C.C. 445 (1946); Continental Steel Corp. v. New York, C. & St. L. R. R., 256 I.C.C. 167 (1943); Mississippi Cotton Seed Crushers Ass'n v. Atlanta, B. & C. R. R., 238 I.C.C. 87 (1940), aff'd 251 I.C.C. 643 (1942).

Illustrative of these decisions is Continental Steel Corp. v. New York, C. & St. L. R. R., supra, relied upon by the Commission in its report. There, the Commission stated:

"Defendants attempt to justify the different treatment accorded complainant and the preferred points by the assertion that the lower rates from the latter points to the Twin Cities were established to meet truck and water competition, and that complainant has failed to show that similar competition exists from Kokomo and Indianapolis. In Mississippi Cotton Seed Crushers Assn. v. A., B. & C. Ry. Co., 238 I.C.C. 87, affirmed by the Commission in 251 I. C.C. 643, division 2 said, at pages 97–98;

"In neither Texas & P. Ry. Co. v. United States, supra [289 U.S. 627, 53 S.Ct. 768, 77 L.Ed. 1410], Texas & P. Ry. Co. v. Interstate Commerce Commission, 162 U.S. 197, [16 S.Ct. 666, 40 L.Ed. 940], nor any other case has it been held that competition is justification in law for undue prejudice. It is

only one factor to be weighed and considered. United States v. Illinois Central R. Co., 263 U.S. 515, [44 S.Ct. 189, 68 L.Ed. 417]. From an administrative standpoint, forceful competition may be a weighty factor, but it may be offset by injury or undue prejudice. A showing of carrier competition from the north Atlantic ports to points in central territory and of potential water competition on the inland waterways does not raise the presumption that rates on import traffic lower than those on domestic traffic are not unduly prejudicial to the domestic traffic and shippers thereof which must be overcome. The existence of such competition and a showing that it justifies an inequality of treatment are factual matters of defense to be proven by satisfactory evidence. Therefore, unless it is established by evidence comprehensive enough to enable us to determine the weight to be given to it as justification for the carriers' failure to treat shippers and competitive descriptions of traffic alike and to determine that the disparity in treatment is not greater than is warranted by dissimilar conditions, a shipper must prevail when he shows, without reference to carrier or water competition, that he is unduly prejudiced." 256 I.C.C. at 173.

Plaintiffs rely upon United States v. Illinois Cent. R. R., 263 U.S. 515, 44 S. Ct. 189, 68 L.Ed. 417 (1924), and California Milling Corp. v. Atchison, T. & S. F. Ry., 276 I.C.C. 531, 544 (1949), as support for their view that the complainant in a Commission proceeding bears the burden of establishing that undue prejudice or preference exists, and that it exists despite the existence of substantially similar transportation conditions. However, in neither case was competition urged as justification for a rate disparity. See Swift Lumber Co. v. Fernwood & Gulf R. R., 61 I.C.C. 485, 490 (1921), the Commission report affirmed by the Supreme Court in United States v. Illinois Cent. R. R., supra. Grand Union Co. v. Erie R. R., 291 I.C.C. 656, 658 (1954), is the only case which has come to our attention in which the Commission has perhaps implied that complainant had the burden to establish that carrier competition did not justify the rate disparity. It is notable here, however, that complainant sought reparations.

Plaintiffs also rely upon Biggs Boiler Works v. Erie R. R., 171 I.C.C. 712, 714 (1931), and Traffic Bureau, Lynchburg Chamber of Commerce v. Norfolk & W. Ry., 237 I.C.C. 408, 412 (1940), for the proposition that the complainant bears the burden of establishing undue prejudice. These cases, however, are not inconsistent with those cited above holding that defendant has the burden on the issue of carrier competition; such competition was not an issue in these cases.

 It thus appears that the ICC, for over twenty years, has ruled that the defendant carriers bear the burden of establishing that competition encountered at the preferred points is sufficiently greater than that encountered at the prejudiced points to justify a rate disparity. We cannot say that this procedure is so unreasonable as to warrant a determination of error. The railroads, as defendants before the Commission, had an opportunity to present evidence on the issue of motor competition, and it does not appear that they, at any point, contended that they lacked means of discovering the facts concerning the amount of motor competition from the area east of the river.

## III. SUFFICIENCY OF EVIDENCE TO SUPPORT FINDINGS

 Plaintiffs urge that the evidence establishes that the rate disparity is properly related to the difference in degree of motor competition. They set forth a chart showing the percentages of truck and rail shipments to the East by "representative" packers on the east of the river as compared with packers

west of the river. They then state, "While the rates [established in the 1958 rate reductions from origins on and east of the river] reattracted some traffic to the railroads from the trucks, percentages moving by truck are still substantially higher from on and east of the Mississippi than from the origins west. In short, the rates complained of have met and still meet the motor truck competition more effectively at the complaining origins than they do at the allegedly preferred origins."

Plaintiffs assert that this evidence was sufficient to establish that the rate disparity was warranted by the difference in degree of motor competition, and that the burden therefore reverted to the complainant to show that the difference in rate levels was not properly related to the difference in competition. This showing, however, did not create a presumption which the complainant was required to overcome. Cf., Mississippi Cotton Seed Crushers Ass'n v. Atlanta, B. & C. R. R., 238 I.C.C. 87 (1940), aff'd, 251 I.C.C. 643 (1942).

The Commission ruled that the defendants had not established by satisfactory evidence that the rate disparity was justified by the difference in competition. It was warranted in so ruling. It pointed out in the report that evidence of the relative degree of competition was meager. There was no evidence regarding competitive motor rates. There was evidence that motor competition from west of the river was increasing. And from Denver, one packer (Swift) was shipping about 50% of its traffic to the East by truck. This figure is not cited by plaintiffs in their chart on page 10 of their brief. (Brief of Intervening Plaintiffs.) The 50% figure is higher than four of the five figures there cited for truck shipments from origins west of the river to the East.

In White & Bagley Co. v. Boston & Me. R. R., 279 I.C.C. 715, 717 (1950), the Commission, in ruling that the defendant carriers had failed to establish competition as warranting a rate disparity, stated as follows:

"They do not show what motor carriers provide the competition from the alleged preferred points, or the motor carrier rates, or the volume of the motor-carrier traffic, or any other details necessary to determine whether the existing rate disparities between the alleged prejudiced and alleged preferred points are warranted."

In the case at bar, the railroads have likewise failed to show such facts bearing upon motor competition.

 It is true that the western truck percentages are for the most part smaller than the eastern truck percentages. But considering that it was not shown with any precision to what degree the competition differs, that competitive motor rates were not shown, and that there was evidence of increasing motor competition from the more western origins, the Commission was warranted in concluding that the defendants had not established that the differences in competition justified the rate disparity. The Commission's finding in this respect cannot easily be overturned. It is the type of finding upon which the Commission's expertise is brought to bear, and the judgment of the reviewing court may not be substituted for that of the Commission. Cf., United States v. Illinois Cent. R. R., 263 U.S. 515, 524, 525, 44 S.Ct. 189, 68 L.Ed. 417 (1924); Chesapeake & O. Ry., 11 F.Supp. 588, 594 (S.D.W. Va.), aff'd, 296 U.S. 187, 56 S.Ct. 164, 80 L.Ed. 147 (1935).

Plaintiffs also contend that unrebutted proof established a dissimilarity in transportation conditions, in that operating conditions at Omaha were more burdensome and time consuming than those at other origins. Plaintiffs note, specifically, testimony to the effect that switching operations to the classification yards at Omaha take 3½ to 4 hours, while the operations at Dubuque take 40 minutes, and those at Madison take 10 minutes for the Northwestern and 30 minutes for the Milwaukee.

The Commission did not consider, nor do we, that these time factors alone are sufficient to justify the type of rate disparity involved in this case. As has been stated above, not absolute but substantial similarity of transportation conditions is required. It is the Commission, not the reviewing court, that judges the weight of the evidence.

## CONCLUSION

In accordance with our determination that the Commission did not commit the errors assigned by plaintiffs, this complaint will be dismissed.

This memorandum shall stand as the Court's findings of fact and conclusions of law within the meaning of Rule 52 of the Federal Rules of Civil Procedure.